UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA


Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
     v.                            )          Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendant.                 )
_____ )


PLAINTIFF DONVILLE JAMES' RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT


    Plaintiff Donville James, by himself, Pro-se, respectfully
submits this response to the following Defendant's motion: Motion
For Summary Judgement For Defendant.


I.   FACTUAL BACKGROUND


    Plaintiff's request to Defendant United States Secret
Service (USSS).


    1)   By letter dated August 22nd, 2005, and received by the
Defendant USSS on September 15th, 2005, the Plaintiff submitted a
request for any and all information in USSS's files concerning
any investigation on him. Plaintiff also requested information
regarding a third party, Allen Duban (Lyerly Exhibit 1).

-1-

2)    By letter dated October 25th, 2005, Plaintiff again
submitted a request for a full disclosure of records contained in
the files of the USSS, one of the Defendants. Plaintiff
specifically stated: "The records sought specifically but not
limited to are the complete file containing:"

1.    The complete Secret Service file (SSF)
      1544 relating to File J-201-735-131941-S.

2.    Compact Disc labled with serial number
      201-2002 CE 000442 which was inventoried
      on SSF 1544.

3.    Compact Disc labled with serial number
      201-2002-DE-000446 which was inventoried
      on SSF 1544.

4.    Maxwell C45 cassette tape labled with
      serial number 201-2002-CE 000443 which
      was inventoried on SSF 1544.

5.    Maxwell Mini Digital Video Cassette
      labled with serial number 201-2002-CE-
      000454 which was inventoried on SSF 1544.

6.    All other files and reports that were
      compiled by the Secret Service in Secret
      Service investigation of Donville James
      in file J-201-735-131941-S.

7.    All recorded conversations and/or
      transcripts of conversations in file SSF
      1544; J-201-735-131941-S (Complaint
      Exhibit A).

3)    In the Defendant's answer to the Plaintiff's Complaint
under the Freedom of Information Act, the Defendant admitted that
the Plaintiff sent a Freedom of Information and Privacy Act
request dated September 24th, 2005, to the Chicago Field Office
of the United States Secret Service (Answer at 1).

-2-

4)    The Defendant further aver that this request was received by the Chicago Field Office on September 30th, 2005, and by the Freedom of Information and Privacy Act (FOI/PA) of the Secret Service on October 19th, 2005 (Answer at 1(g)).

5)    By letter dated October 5th, 2005, the Plaintiff received acknowledgment of the request made on September 15th, 2005 for information pertaining to himself with assigned File Number 20050573 (Complaint EXHIBIT B).

6)    By letter dated November 10th, 2005, Plaintiff received notification that document(s) responsive to the September 15th, 2005 request have been located and forwarded to this office for review. This letter also was Reference File Number 20050573 (Complaint EXHIBIT C).

7)    By letter dated August 31st, 2006, Plaintiff by U.S. Mail sent to Ms. Kathy J. Lyerly pleading for her to look into expediting his request (Complaint EXHIBIT D).

8)    By letter dated January 18th, 2007, Plaintiff received notification that there are no records or documents available to him at this time pursuant to 5 U.S.C. 552(b)(7)(A). This letter was in response to Plaintiff's request first made on October 19th, 2006, which is the complaint of the present litigation. The letter also referenced the same File Number (20050573) as the September 15th, 2005 request. A copy of this letter is attached

-3-

as EXHIBIT 1, Defendant's acknowledgment of the existence of files.

9)    The Master Control Index (MCI) provides a system of record keeping of information for cases and subjects of record in investigative, protective, and administrative files maintained by the Secret Service. An MCI search for records concerning the Plaintiff produced three potential files indexed to Plaintiff's name which were being maintained in the Chicago Field Office of the Secret Service. One of those files dealt with a criminal investigation involving the Plaintiff (hereinafter "Investigative File") and a second file concerned an automobile accident between the Plaintiff and a Secret Service Employee (Motion for Summary Judgment, Statement of Material of Facts at 10).

Exemptions by Defendant USSS.

10)    Defendant USSS cited Exemption (b)(7)(A) as justification to withhold Plaintiff's request (Motion for Summary Judgment, Lyerly 18).

11)    Defendant USSS also cited Exemption (b)(7)(C)[Law Enforcement - Personal Privacy] as justification to withhold Plaintiff's request (Motion for Summary Judgment, Lyerly 21, 22, 23, 25).

12)    Defendant USSS also cited Exemption (b)(7)(D)

-4-

[Confidential Sources and Informant by Confidential Sources] as justification for withholding Plaintiff's request (Motion for Judgment, Lyerly 27).

13) Defendant USSS also cited Exemption (b)(7)(E) as justification for withholding Plaintiff's request (Motion for Summary Judgment, Lyerly 30).

## II.  IN THIS CASE THE REQUISITE "PUBLIC INTEREST" TO DISCLOSURE FAR OUTWEIGHT ANY OTHER INTEREST OR EXEMPTIONS

14) The "core purpose" of the Freedom Of Information Act (FOIA) is the public interest "of shed[ding] light on an agency's performance of it's statutory duties." Reporters Committe for Freedom of the Press; 489 U.S. at 773, 109 S.Ct. at 1482.

## III. EVIDENCE OF GOVERNMENT IMPROPRIETY AND VIOLATION OF UNITED STATES CODES

15) From a surveillance report dated Wednesday, April 17th, 2002, Defendant was charged to investigate Plaintiff in Secret Service case number J-201-735-131941-S. The primary investigation was for Manufacturing Counterfeit Currency (735.041). The secondary case types were for: Dealing in Counterfeit Currency (735.021), and crimes involving use of Emerging Technology (848.930). All three case types relating solely to the matter of counterfeiting United States Currency. A copy of the surveillance report is attached as EXHIBIT 2.

16) During the Grand Jury Testimony in the prosecutors attempt to obtain an indictment against the Plaintiff in his criminal case, the prosecutor, Ms. Hays, asked the criminal informant:

> Q:    Could you state your name and spell your first and last name for the record.
>
> A:    Allen Dubon, A-l-l-e-n, D-u-b-o-n.
>
> Q:    Allen, did you meet with me yesterday and give me a statement regarding the circumstances surrounding the investigation of Donville James?
>
> A:    Yes.
>
> Q:    And did I give you a statement that reflected what you told me the day before?
>
> A:    Yes.
>
> Q:    And did you read that statement carefully?
>
> A:    Yes.
>
> Q:    And is everything in that statement true and correct and based on what you told me?
>
> A:    Yes. (A copy of the criminal informant Grand Jury Testimony is attached as EXHIBIT 4. See page 0060, line 12-25, page 0061, line 1-4)

17) The statement that the criminal informant gave to the prosecutors that was related to the investigation of Plaintiff's counterfeiting investigation by the Defendant USSS was that:

"On several occasions James suggested that he could provide the source (criminal informant) with counterfeit money that the source could use to rip off drugs from a dealer, then the source could sell the drugs for cash to pay off his debt." The entire criminal informant statement is attached as EXHIBIT 5. See page 0136, paragraph 2.

18) The prosecutors acted negligently and improperly performed their duties in their pursuit to obtain an indictment against Plaintiff in his criminal case.

19) Despite of what the criminal informant told the prosecutors in his statement, the prosecutor with a total disregard for the truth gave the criminal informant a prepared statement to read before the Grand Jury in what they said was based on the truth and "correct" and based on what the criminal informant told them.

20) The prosecutors in their prepared statement for the criminal informant to read before the Grand Jury in Plaintiff's criminal case wrote:

1. "On March 16th, 2001, James called me and we agreed that he would purchase 1 kilo of cocaine from my source for $20,000 in counterfeit money."

2. "On march 21st, 2002, we agreed that James would purchase 10 kilos of cocaine from my source for $200,000 in counterfeit money."

3. "On March 22nd, 2002, James called me and asked whether he could buy 20 kilograms from my source. I told him

I will have to see whether my source
had 20 kilograms available."

4. "On March 24th, 2002, James and I
agreed that he will purchase 15
kilograms from my source and pay
$300,000 in counterfeit currency. He
told me he would pay me $20,000 in
real currency for arranging that
transaction."

5. "On March 25th, 2002, James and I
met in McDonald's parking lot to
further discuss the conduct of that
transaction." A complete copy of the
Prosecutors prepared statement is
attached as EXHIBIT 6.

21) FBI Special Agent Frank DeRodesta, despite of what the
criminal informant told the prosecutors in his statement,
submitted a false affidavit in the criminal complaint in
Plaintiff's criminal case. Special Agent DeRodesta wrote in his
affidavit:

1. "In March 2002, a cooperating individual
(CI) provided the FBI with information
about an individual known to the CI as
"James". The CI explained that James
asked if the CI would be willing to
arrange a narcotics transaction in which
James would pay for powder cocaine with
counterfeit United States Currency." A
copy of Agent DeRodesta's complaint
affidavit is attached as EXHIBIT 7, see
paragraph 3.

2. "The CI agreed to work with the FBI and
Secret Service to do an undercover
operation. As part of this operation,
the CI told James he knew a cocaine
supplier who could provide them with
powder cocaine." (See EXHIBIT 7,
paragraph 5)

3. "On March 21st, 2002, the CI met James
at an Amoco Gas Station located on West

-8-

North Avenue and North Eleton Avenue
in Chicago"...."In this conversation
James and the CI agreed to purchase
10 kilograms of cocaine for $200,000
in counterfeit currency from the
CI's source. The CI was equipped
with a concealed recording device
and a transmitting device allowing
the surveillance agents to monitor
their conversation." (See EXHIBIT 7,
paragraph 7).

4.    "On March 22nd, 2002, Defendant
James Donville asked the CI if he
could obtain 20 kilograms of powder
cocaine. The CI said he would call
his supplier and see if 20 kilograms
were available." (See EXHIBIT 7,
paragraph A).

5.    "On March 24th, 2002, the CI placed
a recorded telephone call to the
Defendant James Donville. They
agreed to purchasing 15 kilograms of
powder cocaine for $300,000. (See
EXHIBIT 7, paragraph 10)

6.    On March 25th, 2002, the CI and
James had several telephone
conversations in which they agreed
to meet at the McDonald's restraunt
in the Brick Yard Mall, at the
corner of Diversey and Naragansett
in order to further discuss and
conduct the transaction. At the
meeting, the CI was equipped with a
concealed recording device and a
transmitting device allowing the
surveillance agents to monitor
their conversations. (See EXHIBIT
7, paragraph 11)

22)   "Whoever procures another to commit perjury is guilty

of subornation of perjury," in violation of 18 U.S.C. 1622,

Subornation of Perjury.

23)   The prosecutors prepared a statement for the criminal

-9-

informant to read before the Grand Jury as testimony in
Plaintiff's criminal case which was not only contradictory but
was utterly false. The prosecutors are in violation of 18 U.S.C.
1622, Subornation of Perjury Statute.

24)  A person commits perjury when he provides false
testimony about a material fact while under oath or affirmation,
with the willful intent to do so, rather than as a result of
mistake, faulty memory, or confusion. United States v. Graig,
178 F.3d 891(7th Cir. 1999); United States v. Woody, 55 F.3d
1257, 1273(7th Cir. 1995); United States v. Hikok, 77 F.3d,
1006-07(7th Cir. 1996).

25)  The criminal informant willfully testified falsely
before the Grand Jury in Plaintiff's criminal case when he read
the prosecutors prepared statement as his testimony of which he
knew was false, which is a violation of 18 U.S.C. 1623(a).

26)  FBI Agent Depiodesta willfully and intentfully
submitted a false affidavit to the Majestrate Judge in his
complaint affidavit in Plaintiff's criminal case, knowing such
affidavit was false, in violation of 18 U.S.C. 1623(a).

## IV.  OTHER EVIDENCE OF GOVERNMENT IMPROPRIETY AND VIOLATION OF UNITED STATES CODE

27)  Plaintiff submitted a pretrial motion for the

-10-

Government to provide copies of all audiotapes created in Plaintiff's criminal case. A copy of the pretrial motion is attached as EXHIBIT 8.

28) Plaintiff in his criminal case also submitted a pretrial motion for the Government to produce the March 25th, 2002 audiotape and tape recorder which "failed" for examination by Defendant's tape expert. This motion was necessary due to the fact that the Government stated that although its informant was wearing a recording device and a transmitting device in conversations with Plaintiff on March 25th, 2002, that the conversations were not on tape because the tape recorder failed. A copy of the motion is attached as EXHIBIT 9.

29) The Prosecutors responded to these motions in a "Governments consolidated response to Defendant Donville James' pretrial motions." A copy of which is attached as EXHIBIT 10.

30) The Government's response to the motion to provide copies of all audiotapes created in Plaintiff's criminal case was that "the Government has just finished copying the tapes related to this case. Defendant's counsel will be receiving those tapes by the end of the week." (EXHIBIT 10, paragraph G).

31) The Government stated in their response to Plaintiff's second criminal case motion was that:

-11-

> "...The "tape recorder" is actually
> a digital recorder which burns
> recorded conversations directly
> onto a CD rom. When the
> conversations are recorded onto the
> CD rom, they are automatically
> erased from the digital recorder,
> and the CD rom itself becomes the
> evidence." (EXHIBIT 10, Part H).

32)  Chapter 119, Title 18, Section 2518 governs the

procedure in which oral communications are intercepted.

33)  Title 18 U.S.C. 2518 specifically states:

> "The contents of any wire, oral, or
> electronic communication must be
> recorded on tape, or wire, or
> comparable device (like a CD). The
> recording shall be done in such a
> way as to protect against editing
> or other alterations. The original
> recordings shall not be destroyed,
> and in any event shall be kept for
> ten years."

34)  Chapter 119, Title 18, Section 2517 permits

duplicating the recording for use or disclosure, but only to the

provisions of Subsection (1) and (2) of Section 2517 of Chapter

119 for investigation.

35)  The statutes only allow recording directly to a

"wire", "tape", or "comparable device" (like a CD rom). It does

not allow recording in the digital memory of any devices that

would erase the original recording. In order for the digital

recorder to be used as a "comparable device" the recorder itself

-12-

with the original recording in its memory would have to be
preserved and maintained for ten years.

36) The Government violated 18 U.S.C. 2518 and 2517,
Subsection (1) and (2) of Chapter 119 U.S.C. in 'allegedly'
destroying the original recordings which violate Mr. Jame's
substantial Rights to Due Process to a fair trial.

## V. THE GOVERNMENT WILLFULLY AND INTENTIONALLY MISLED THE COURT ABOUT THE EXISTANCE OF THE RECORDING

37) During Plaintiff's ciminal case trial proceedings, FBI
Special Agent Frank DeRodesta testified under oath that all
"audio recorded conversations were recorded in the memory of the
recording device". Agent DeRodesta then testified that the
contents of the recorded conversations were then later
transferred over to a CD or a cassette, and the original content
then "erased" from the "memory of the recording device".

38) The Prosecutors submitted a motion to the court in
which they state that:

> "Defendant's request to examine the
> "tape recorder which failed" should
> be denied. The "tape recorder" is
> actually a digital recorder which
> burns recorded conversations
> directly on a CD rom. When the
> conversations are recorded onto the
> CD rom, they are automatically
> erased from the digital recorder,
> and the CD rom itself becomes the

-13-

evidence. The audiotapes that will
be provided to defense counsel are
dubbed from the CD rom....."

"...The recorder "Bailed" at the
time of the March 25th transaction
at issue because it was not turned
on. The agents involved in the case
were testing the equipment prior to
the transaction. In testing the
equipment, they were turning it on
and off. After testing the
equipment, they left if off by
mistake." (EXHIBIT 10, part H).

39)   Immediately after Plaintiff's criminal case ended

defense trial counsel was fired for not raising these critical

issues before the court.

40)   Upon defense trial counsel's removal from Plaintiff's

criminal case, counsel turned over all legal material over to

the Plaintiff, which included evidence that the Prosecutors were

in possession of the recorded conversations which they claimed

was not recorded because the equipment "Bailed".

41)   According to Agent Frank DePodesta's report attached

as EXHIBIT 11, Agent DePodesta activated the recording device

and transmitting device on the informant at approximately

11:06am on March 25th, 2002. (See Paragraph 5 of EXHIBIT 11).

42)   And according to the same report, Agent DePodesta

deactivated the recording device and transmitting device on the

informant at approximately 12:30pm on March 25th, 2002

immediately after Plaintiff was arrested by the Secret Service

-14-

(See last paragraph of EXHIBIT 10).

43) This particular piece of evidence was listed in the Disposition of Evidence, Contraband, and Property List dated June 4th, 2002 at 3:54pm by Special Agent Daniel Dick of the Secret Service.

44) The recorded conversation was logged into evidence as:

> "One (1) compact disc, containing a recording of the body wire place on the criminal informant by the Federal Bureau of Investigation on February 25th, 2002 (the same day Plaintiff was arrested), has been inventoried on SSF 1544 with serial number 201-2002-CE-000442." (See EXHIBIT 12, paragraph 4)

45) The same March 25th, 2002 recorded conversation was also inventoried and listed in a Certified Inventory of Evidence List.

46) The description of evidence section of the Certified Inventory of Evidence Report described the recording as:

> "The below listed item was recovered from Agent DeRodesta of the Federal Bureau of Investigation on February 25th, 2002."
>
> "Marked for 'identification' "DD March 25th, 2002 (SA Daniel Dick."
>
> "Compact disc, approximately 41 minutes in length, compact disc in contained in a jewel case."

-15-

47)  The Certified Inventory of Evidence Form lists the March 25th, 2002 recording with serial number 201-2002-CE-00042, which is the same serial number as listed in the Disposition of Evidence, Contraband, and Property List (EXHIBIT 13).

48)  Judging from the two inventory lists, the recording that the Government told the court did not exist because the agents "turned the equipment off by mistake" was inventoried in Defendant's USSS file SSF 1544 with serial number 201-2002-CE-000442, and is 41 minutes in length.

49)  Compact Disc labled with serial number 201-2002-CE-000442 which was inventoried on Defendant's USSS file SSF 1544 is one of the specific requests that was made by the Plaintiff September 24th, 2005 FOIA request to Defendant USSS as item number 2.

## VI.  ALL RECORDED CONVERSATIONS IN PLAINTIFF'S CRIMINAL CASE WERE RECORDED ACCORDING TO THE PRESCRIBED STATUTE

50)  Agents of the federal law enforcement agencies are quite aware of the procedures of 18 U.S.C. 2511, 2517, and 2518 for the collection and the maintenance of recorded communication and would not gather recorded evidence in the manner described by FBI Special Agent DeBodesta and the Prosecutors to the court in Plaintiff's criminal case.

51)  In fact, all the recording in Plaintiff's criminal

-16-

were done using equipment prescribed by 18 U.S.C. 2518. The
"original" copies were not "erased". They are locked away in
Secret Service file SSF 1544.

52)  The "original" copy of the March 25th, 2002 recorded
conversation, which is on a compact disc labled with serial
number 201-2002-CE-000442 was inventoried on Defendant's USSS
file 1544 (EXHIBIT 12, paragraph 4, EXHIBIT 13).

53)  The "original" copy of the March 21st, 2002 recorded
conversation, which is a compact disc labled with serial number
201-2002-CE-000446 was inventoried on Defendant's USSS file SSF
1544 (EXHIBIT 12, paragraph 5, EXHIBIT 14).

54)  The "original" copy of the March 24th, 2002 recorded
conversation, which was labled with serial number 201-2002-CE-
000443 was inventoried on Defendant's USSS file SSF 1544
(EXHIBIT 12, paragraph 3, EXHIBIT 15).

55)  The "original" copy of the March 25th, 2002 video
recording labled with serial number 201-2002-CE-000454 was
inventoried on Defendant's USSS file 1544 (EXHIBIT 6).

56)  All listed material with serial numbers were a part
of Plaintiff's September 24th, 2005 FOIA specific request to
Defendant USSS.

-17-

57) The copies that were played for the Jury at Plaintiff's criminal trial and disclosed as discoveries were all egregiously tampered and manipulated with to suit the Government's case.

58) Plaintiff made a timely request for discovery material. The Government violated 18 U.S.C. 2518 and 2517, Subsection (1) and (2) of Chapter 119 and failed in their obligation to disclose under Rule 16, Fed. R. Crim. P. and Brady v. Maryland, and violated Plaintiff's Due Process Rights to a fair trial guaranteed by the Constitution of the United States.

## VII. GOVERNMENT WILFULLY AND PURPOSELY FAILED TO FULFILL THEIR OBLIGATION

59) The Government responded to Plaintiff's pretrial "Motion for Disclosure and Impeachment Information" by stating that:

> "Defendant has filed a motion seeking disclosure of 23 catagories of impeaching and exculpatory information, pursuant to Brady vs. Maryland, 373 U.S. 83 (1963) and Giglio vs. United States, 405 U.S. 150 (1972). Without addressing the propriety of the catagories' scope and breedth, the Government acknowledges its obligations under both Brady and Giglio."

60) The Government understands that it has a continuing

obligation under <u>Brady</u>, and should any Brady material exist, the Government will disclose the material two weeks prior to trial. In addition, the Government will honor its obligation to provide Defendant with evidence bearing on witness credibility, pursuant to <u>Giglio</u>. The Government does not object to providing all Giglio material in it's possession two weeks prior to trial (EXHIBIT 10, part D).

61)  The Government also agreed to provide Plaintiff with the informant telephone records of his home phone number within a day of receiving them (EXHIBIT 10, part C).

62)  The Government also agreed to arrange a telephone conference or a metting at the U.S. Attorney's office with the Plaintiff's trial attorneys if the informant agreed to meet with the defense (EXHIBIT 10, part F).

## VIII. EXEMPTION (b)(7)(A) IS NOT JUSTIFIED TO WITHHOLD PLAINTIFFS REQUEST

A.    The Responsive Documents are not protected by FOIA Exemption 7(A). Exemption 7(A) authorizes agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent the production of such law enforcement records or information... could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A)

The "core purpose" of the FOIA is the public interest "of shed[ding] light on an agency's performance of it's statutory

duties." <u>Reporter Committee for Freedom of the Press</u>, 484 U.S. at 773, 109 S.Ct. at 1482. In this case, the requisite "public interest" to disclosure far outweigh  any other interest and exception (b)(7)(A).

## IX.  VIOLATION OF 18 U.S.C. 1622 AND 1623

A.    The Government's informant in the Plaintiff's criminal case never mentioned to the Prosecutors, Ms. Hays, Mr. Collins, nor any FBI or Secret Service agents that Plaintiff ever asked to purchase drugs from the informant's source.

Before the informant testified before the Grand Jury, Prosecutor Valarie Hays provided him with a prepared statement for him to read before the Grand Jury, in which he did. The Prosecutors had prior knowledge based on recorded conversations in Defendant USSS'S possession, and the statement taken from the informant that they were providing the Government Informant with a perjured statement to read before the Grand Jury as his testimony for what took place in the Secret Service's investigation of Plaintiff. The perjured statements formed the basis for the Grand Jurys investigation, and were meant to influence the decision of the Grand Jury to return an indictment against Plaintiff for narcotics and gun charges in his criminal case.

Acting upon the instruction of the Government, the informant read the Prosecutors prepared statement before the Grand Jury as his testimony for the events that took place in the Secret Service's investigation of the Plaintiff. These statements were the principal focus of the Grand Jury's inquiry and

-20-

constitute the basis of their investigation. The statements made
by the informant before the Grand Jury postulated the Government
and informant's deceit.

There would not have been either an indictment against the
Plaintiff nor a public trial for narcotics and gun charges if
the Prosecutors did not suborn perjury, an 18 U.S.C. 1622
violation, and the informant did not perjure himself before the
Grand Jury, an 18 U.S.C. 1623(a) violation. The Prosecutors
created a chain of causation with their perjured prepared
statement, which resulted in the conviction of the Plaintiff for
narcotics and gun charges. Prosecutor Hays, and Collins
contrived a conviction on narcotic's and gun charges through the
pretense of a trial which in truth was used as a means to
deprive the Plaintiff of his liberty through a deliberate
deception of the Grand Jury, court, and trial jury by the
presentation of manipulated recorded conversations and false testimony.

The entire "Investigative File" of Defendant Secret
Service, but more importantly, the specific material requested
by the Plaintiff would "shed" light on Defendant's USSS
"performance of it's statutory duties," and prove the Defendant
USSS was in gross violation of the "statutory duties".


B.    The Government admitted to destroying the "original"
copies of materials pertaining to Plaintiff's criminal case.
Namely, the original recordings of all recordings in Plaintiff's
criminal case. However, evidence submitted as EXHIBITS 11, 12,
13, 14, 15, and 16 show this not to be true. The copies that
were played at Plaintiff's criminal trial and disclosed as

-21-

discoveries were egregiously manipulated to suit the
Government's case against the Plaintiff. Plaintiff made a timely
request for discovery material. The Government violated 18
U.S.C. 2518 and 2517, Subsection (1) and (2) of Chapter 119
according to the Government's own evidence and testimony at the
Plaintiff's criminal trial. All this in an attempt not to
fulfill their obligation pursuant to Rule 16, Fed. R. Crim. P.
and Brady because disclosure of the requested material would
have been harmful to the Government's case, in the sense that
the disclosure would have shown that the Grand Jury, Court and
trial jury was deliberately deceived by the presentation of
manipulated recorded conversations and testimony by the Prosecutors
and the informant that they knew to be false.

The Prosecutors disclosed materials at the Plaintiff's
criminal trial that were "dubbed from the CD rom" that they
recorded from "a digital recorder" which the Government claimed
"automatically erased" after the CD roms were made. This is not
just an egregious violation of 18 U.S.C. 2518 and 2517, but it
is also criminal under 18 U.S.C. 1519.

Assistant U.S. Attorney Valarie Hays and Patrick Collins
did knowingly violate 18 U.S.C. 1519, Destruction, Alteration,
or Falsification of records in Federal Investigation and
Bankruptcy, by knowingly altered, destroyed, and manipulated
evidence with the intent to impede, obstruct and to influence
the proper administration of the Plaintiff's criminal case
#02 CR 278.

Assistant U.S. Attorney Valarie Hays  and Patrick Collins,
FBI Agent Frank DeModesta, Secret Service Agent Daniel Dick, and

-22-

Government informant Allen Dubon did knowingly violate 18 U.S.C. 241, Conspiracy against Rights in that they conspired to gather to deprive Plaintiff of his Constitutionally guaranteed rights to due process of law, a fair trial, and equal protection of the law in Plaintiff's criminal case #02 CR 278.

Assistant U.S. Attorney Valarie Hays, and Patrick Collins deprived the Plaintiff of Rights guaranteed by the Federal Constitution under color of law in violation of 18 U.S.C. 242, Color of Law, by prosecuting Plaintiff on fictitious charges.

The Defendant cites Exemption (b)(7)(A) as reason not to disclose the Plaintiff's request stating that "the production of the withheld information could reasonably be expected to interfere with the on-going appeal of Plaintiff's September 10th, 2002 conviction of several criminal offenses for counterfeiting".

The Plaintiff's convictions were only made possible because Defendant USSS and Defendant FBI did not live up to, and perform their "duties" as were required by the respective governing statutes. It was the Plaintiff's rights guaranteed by federal and state law, the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to have the requested material disclosed to him in his criminal case defense. It is still the case today.

Defendant USSS also stated that "Disclosure of these records could also harm the Government's defense of the Plaintiff's appeal". And that "until Plaintiff's conviction is final, release of the information in the "Investigative File" could reasonably be expected to cause substantial harm." The

-23-

only harm in disclosing the requested material is that the Government's defense of Plaintiff's appeal will not be able to withstand the regerous test of American Jurisprudence.

The Plaintiff was deprived of liberty without due process of law. The Supreme Court in <u>Morney vs. Holohan</u>, 294 U.S. 103, 112-113, 55 S.Ct. 340, 341-42, 79 L.Ed. 791 (1935), quoting <u>Robb vs. Connolly</u>, 111 U.S. 624, 637, states ("Upon the state courts, equally with the courts of the Union, rest the obligation to guard and enforce every right secured by the Consitution").

Defendant cannot use the proceedings in which they were obligated by law to disclose the requested materials, the proceedings in which Plaintiff's substantial rights were grossly violated - as reason not to disclose the requested materials under Exemption (b)(7)(A). This court must enforce it's obligation to guard the Plaintiff's Rights secured by the Federal Constitution and order that the "public interest" for disclosure far outweigh the interest of Exemption (b)(7)(A), and that the Plaintiff had a right to disclosure in his criminal defense and still has that right today.

## X.    EXEMPTION (b)(7)(C) IS NOT JUSTIFIED TO WITHHOLD PLAINTIFF'S REQUEST

A.    Exemption 7(C) of the FOIA exempt from mandatory disclosure information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy". 5 U.S.C. § 552 (b)(7)(C).

Defendant USSS and Defendant FBI acted negligently and improperly in the performance of their duties. In order to avoid their obligation to disclose the requested material guaranteed to the Plaintiff by Federal laws and State and Federal Constitutions, Defendant FBI perjured himself before the trial court about material facts of the Plaintiff's criminal case, which denied Plaintiff the right to have his trial jury hear evidence that was exculpatory in nature.

Defendant FBI testified, and the Government told the court that the specific items requested from Defendant (original copies) were "erased" from the memory of the recording device after they were copied onto a CD rom (EXHIBIT 10, part H).

It is now known that this assertion is not true. In fact, Defendant FBI followed the procedure required by 18 U.S.C. 2518 to record the items now requested by the Plaintiff. The individual items were then turned over to Defendant USSS which inventoried the "original" copies on SSF 1544 in the vault of their Chicago Field Office (EXHIBIT 12, 13, 14, 15, and 16). It was from those original copies Defendant USSS "dubbed" copies that were given to the Prosecutors to be used in Plaintiff's criminal trial, pursuant to 18 U.S.C. 2517, Subsection (1) and (2). The original copies were then locked away for preservation pursuant to 18 U.S.C. 2518.

The copies that were disclosed at the Plaintiff's criminal trial were dubbed from the Prosecutors copy. It was at this stage of the process that the Defendants acted negligently and improperly performed their duties. 18 U.S.C. 2518 states that

-25-

"the recording shall be done in such a way as to protect against editing or other alterations." The Government edited, altered and manipulated the copies that were used at the Plaintiff's criminal trial for disclosure purposes and Government's evidence.

The Government at the Plaintiff's criminal trial even went as far as having Agent DeModesta of Defendant FBI testify falsely before the Plaintiff's trial court that requested item number 2 of the September 24th, 2005 FOIA request did not exist, even though Defendant USSS inventoried the "original" copy of this specific item in SSF 1544 with serial number 201-2002-CE-000442 (EXHIBIT 12, paragraph 4, EXHIBIT 13).

There are no privacy interests at stake in disclosure. A public trial was held and the materials requested in Defendants' USSS "Investigative File" were by law to be disclosed for the proper administration of that public trial. The tactics employed by the Government and the Defendants not to disclose the materials at the Plaintiff's trial were not strategies in advocating the United States' cause but were means of undermining the integrity of the criminal justice system of the United States.

This court should order that the Defendants acted negligently or otherwise improperly performed their duties in Plaintiff's criminal case, and that "public interest" for disclosure far outweigh the interest of Exemption (b)(7)(C), and that the Plaintiff has a right to disclosure.

## XI.  EXEMPTION (b)(7)(D) IS NOT JUSTIFIED TO WITHHOLD PLAINTIFF'S REQUEST

A.    Title 5, United States Code, Section 552 (b)(7)(D) exempts from disclosure "records or information compiled for law enforcement purpose [which] could reasonably be expected to disclose the identity of a confidential source, .... and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation... information furnished by a confidential source." This exemption is not justified because the person of interest, "Allen Dubon", was not a "confidential source."

During the course of the investigation in which Defendant USSS's Investigative File" was generated, the informant was never listed as a "confidential source". In one report the informant as, "cooperating individual CI" (EXHIBIT 7, paragraph 4). The informant is listed in EXHIBIT 12, paragraph 4 as a "criminal informant". The criminal informant testified before the Grand Jury that his name is "Allen Dubon", which was part of the disclosure made for trial purposes (EXHIBIT 4).

The specific material requested in Plaintiff's September 24th, 2005 request to Defendant USSS does not contain anything that would disclose the whereabouts of the "criminal informant" "Allen Dubon". And if it does, that kind of information could easily be blacked out. For the "public interest" cited in Sections XIII and X, the court should order that Exemption (b)(7)(D) is not justifiable, and that disclosure should be made in full.

## XII. EXEMPTION (b)(7)(E) IS NOT JUSTIFIED TO WITHHOLD PLAINTIFF'S REQUEST

A.    5 U.S.C. Section 552(b)(7)(E) exempts from disclosure "records or information compiled for law enforcement purposes" the disclosure of which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

The Plaintiff's request, more specifically the specific request are for materials that should have been disclosed for proper administration of Plaintiff's criminal case. Those disclosures were not made, which is what brought forth this litigation. Any material that falls under Exemption (b)(7)(E) could easily be made sergrable and the rest of the "Investigative File" be disclosed. The "public interest" cited in Sections XIII and X far outweigh Exemption (b)(7)(E).

The court should order that segregation be made for Exemption (b)(7)(E) and that the rest of the "Investigative File" be disclosed.

## XIII. CONCLUSION

WHEREFORE, for the forgoing reasons "Motion for Summary Judgment for Defendant" should be denied. The Honorable Court should order that:

-28-

1.    That all requested material is discovery material in criminal case #02-CR-278, and are not exempt from the public. And that declaratory relief in that Defendant USSS be declared in violation of FOIA/PA.

2.    Injunctive relief in that Defendant USSS be ordered to provide Plaintiff access to all the requested records.

3.    That those proceedings be expedited according to FOIA/PA laws.

4.    That sanctions be imposed against those found to knowingly and willingly deprive the Plaintiff of his due access.

5.    That Defendant USSS be ordered to provide a full Vaughn Itemization and Indexing with justification by sworn affidavit for records yet to be withheld.

6.    That the court decide  on the merits of Plaintiff's "Affidavit of Criminal Charges by witness and victim of Criminal Activities".

7.    Any further relief this Honorable Court deems just and proper.

Respectfully Submitted,

Donville James
#14388-424

-29-

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

RECEIVED

MAY 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Donville James,                    )
                                   )
           Plaintiff,              )
                                   )
      v.                           )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
           Defendants.             )
_____     )

## NOTICE OF FILING

To:  Benton G. Peterson
     Assistant United States Attorney
     Judiciary Center Building
     555 4th Street, N.W.B. Civil Division
     Washington, D.C. 20530

     Please take notice that on __14__ day of __5__ 2007, I

cause to be filed with the clerk for the U.S. District Court in

the District of Columbia, the following:

     1.   Plaintiff Donville James Responds to Defendant's
          Motion for Summary Judgement.


     2.   Affidavit of criminal charges by witness and
          victim of criminal acitivities.


And service of which is being made upon you.


                              Respectfully Submitted,

_____         By: _____
     Date                         Donville James, Pro-se
5/14/07

-1-

## CERTIFICATE OF SERVICE

I, Donville James, state that on ___14___ day of ___5___
2007, certified that I served a copy of the foregoing notice and
Plaintiff Donville James' response to DEFENDANT'S MOTION FOR
SUMMERY JUDGEMENT, AND AFFIDAVIT OF CRIMINAL CHARGES BY WITNESS
AND VICTIM OF CRIMINAL ACTIVITIES on the parties addressed in
the foregoing page, by U.S. Mail delivered on said date.


_____
Donville James, Pro-se

Donville James                                  Re: Case Civ. No. 06-
c/o                                                 1951(GK)


Bond_____ County        )
Illinois                       )
United States of America       )


### AFFIDAVIT OF CRIMINAL CHARGES BY WITNESS
### VICTIM OF CRIMINAL ACTIVITIES


I, Donville James, Affiant, a man upon the free soil of
America, in capacity as beneficiary of the Organic Original
Jurisdiction, State Affiant is of legal age, competent to
testify, has personal first hand knowledge that the truth and
facts herein are true, correct, complete, not misleading, so
help me true God.


### OPENING STATEMENT

On March 25th, Anno Domni, 2002, your affiant was arrested
by agents of the United States Secret Service, who took affiant
to the Secret Service field office located downtown Chicago,
Illinois. Affiant was advised by Agent MeKenna of the Secret
Service that affiant was being arrested by the Secret Service
for manufacturing United States Currency.

At approximately 5:30pm  on March 25th, Anno Domni, 2002
affiant was taken before the United States Magistrate, the
Honorable Judge Schenkier, who released affiant on a $200,000
property bond, and ordered affiant to appear at the United
States Courthouse on April 11th, 2002 for arraignment.

-1-

Affiant appeared before the Honorable Sidney Schenkier on April 11th, Anno Domni, 2002, at which time affiant's attorney advised affiant to waive his probable cause hearing. The Honorable Sidney Schenkier then advised affiant that the Government had filed a three count indictment against affiant, which included:

Count One:   Attempt to possess with intent to distribute in access of five kilograms of powder cocaine in violation of 21 U.S.C. 846.

Count Two:   Possession of a firearm during and in relation to and in furtherance of a drug trafficking crime; in violation of 18 U.S.C. 924(c)(1)(a)(1).

Count Three: Intent to defraud, possess and conceal falsely, made, forged, and counterfeit obligations of the United States; in violation of 18 U.S.C. 472.

Affiant entered a plea of not guilty to all three counts.

Instead of charging affiant for manufacturing United States Currency and charges relating to counterfeiting matters, Agent Frank DeModesta of the department Defendant FBI presented a sworn affidavit to the United States Magistrate, the Honorable Sidney I. Schenkier to establish probable cause on the charges the Government brought against the affiant.

In order to demonstrate probable cause to the U.S.

Magistrate for narcotics and gun charges against affiant, Agent Frank DePodesta of Defendant FBI in his sworn complaint's affidavit included false, misrepresentation of material facts, and intentional misrepresentation of the truth (EXHIBIT 7).

In order to have an indictment returned against affiant on narcotics and gun charges, Assistant U.S. Attorney Valerie Hays demonstrated a reckless disregard for the truth by providing the government criminal informant with false, misrepresentation of material facts, and intentional misrepresentation of the truth in a prepared statement the government informant  read before the Federal Grand Jury (EXHIBIT 6).

In order to get a conviction against affiant on narcotics and gun charges, Assistant U.S. Attorney Valerie Hays and Patrick Collins intentionally suppressed and manipulated evidence (Plaintiff, part II).

## CRIMINAL CHARGES

1.    Agent Frank DePodesta of Defendant FBI did knowingly and willfully violate 18 U.S.C. 1001, Fraud and False ßtatement, by making material false, fictitious, fraudulent statement, and representation in his complaint's affidavit establishing probable cause, knowing same contained materially false, fictitious, fraudulent statements, and entries.

-3-

2.    The Government informant Allen Dubon did
      knowingly violate 18 U.S.C. 1623(a), False
      Declaration before the Grand Jury, by
      knowingly making false material declaration
      before the Grand Jury, knowing the same to
      contain false material declaration.

3.    Assistant U.S. Attorney Valerie Hays procured
      the Government's informant to commit Perjury
      in violation of 18 U.S.C. 1622, Subornation
      of Perjury, by giving the Government's
      informant a prepared statement to read before
      the Grand Jury, knowing the same to contain
      materially false, fictitious statements and
      entries.

4.    Assistant U.S. Attorneys Valerie Hays and
      Patrick Collins did knowingly violate 18
      U.S.C. 1519, destruction, alteration, or
      falsification of records in federal
      investigation and bankruptcy, by knowingly
      altered, destroyed, and manipulated evidence
      with the intent to impede, obstruct and to
      influence the proper administration of case
      #02 CR 278.

5.    Assistant U.S. Attorneys Valerie Hays,
      Patrick Collins, Agent Frank DeModesta of

                          -4-

Defendant FBI, Agent Daniel Dick of
Defendant USSS, and Government informant
Allen Dubon, did knowingly violate 18 U.S.C.
241, Conspiracy against Rights, in that they
conspired to gather to deprive affiant of his
Constitutionally guaranteed rights to due
process of law, a fair trial, and equal
protection of the law in case #02 CR 278.

6.    Assistant U.S. Attorneys Valerie Hays, and
Patrick Collins deprived affiant of rights
guaranteed by the Federal Constitution under
color of law in violation of 18 U.S.C. 242,
color of law, by prosecuting affiant on
fictitious charges.

Know all men by these presents, all whom have eyes to see,
ears to hear, citations and other presentments, from government
bodies politics, on the alleged authority of state code require
execution as "a cloak to disguise a collateral undertaking" in
U.S. Funds and/or Imprisonment. As a result, these so-called
codes are not "duly enacted" upon affiant under Original Organic
State Constitution.

Further, Affiant Sayeth Not.

Donville James

-5-

Executed this ___11___ day of the ___MAY___ month, Anno Domni, in the year two thousand zero hundred seven, in ___Bond___ county, de, jure, The State of ___Illinois___ organic.

L.S. ___[signature]___    [Seal]

only in correct public capacity as beneficiary to the Original Jurisdiction, witness and victim to criminal activities.


I, ___MARILYN A. WARREN___, in correct public capacity as notorial officer, in and for ___Bond___ county, the State of ___Illinois___, United States of America, Original jurisdiction, State; before me personally appeared Donville james, in correct public capacity as beneficiary of Original Jurisdiction, did in, my presence, and under penalty of perjury in Original Jurisdiction, affirm the facts above are true correct, complete. Certain, not misleading, of first hand knowledge, did set his hand hereto on this the ___11th___ day of the ___MAY___ month, Anno Domni two thousand zero hundred seven so help me God.
[Seal]


Notary Public, ___[signature] Marilyn A. Warren___, my commission expires: ___9-12-07___

OFFICIAL SEAL
MARILYN A. WARREN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES SEP...

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )          Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendants.                )
_____)

EXHIBITS "1"



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

JAN 18 2007

Donville James
#14388-424
FCI Greenville
P.O. Box 5000, Unit 2B
Greenville, IL 62246

File Number:   20050573

Dear Requester:

This letter is in reference to your recent Freedom of Information/Privacy Acts correspondence received by the United States Secret Service on October 19, 2006, for information pertaining to yourself.

With regard to your request to have access to your file, we regret to inform you that we cannot comply. Under provisions of the Freedom of Information Act, there are no records or documents available to you at this time.

Pursuant to 5 U.S.C. 552(b)(7)(A), your file is being exempted since disclosure could reasonably be expected to interfere with enforcement proceedings. The citation of the above exemption is not to be construed as the only exemption which may be available under the Freedom of Information Act.

If you disagree with our determination, you have the right of administrative appeal within 35 days by writing to Freedom of Information Appeal, Deputy Director, U.S. Secret Service, 245 Murray Drive, Building 410, Washington, DC 20223.

Please use the file number indicated above in all future correspondence with this office.

Sincerely,

Kathy J. Lyerly
Special Agent In Charge
Freedom of Information &
Privacy Acts Officer

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA


Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,)
Department of Justice,             )
                                   )
        Defendants.                )
_____)


EXHIBITS "2"

**Subject: CT: 735.041 (J-201-735-131941-S) DONVILLE JAMES/SURVEILLANCE**
**REPORT**
**Date:** Wed, 17 Apr 2002 08:35:28 -0500
**From:** chi <chi@officialmail.usss.treas.gov>
**Organization:** United States Secret Service
**To:** cf1@officialmail.usss.treas.gov
**CC:** isd@officialmail.usss.treas.gov, chi@officialmail.usss.treas.gov **ORIGINAL**

| | | | | |
|---|---|---|---|---|
| OFFICE | : | CHICAGO | CASE: | J-201-735-131941-S |
| ORIGIN | : | FIELD | | |

| | | |
|---|---|---|
| TYPE OF CASE | : | MANUFACTURING CFT CURRENCY (735.041) |
| SECONDARY CASE TYPE | : | DEALING IN COUNTERFEIT CURRENCY (735.021) |
| | | CRIMES INVOLVING USE OF EMERGING TECHNOLOGY (848.930) |
| STATUS | : | CONTINUED |
| TITLE OR CAPTION | : | DONVILLE JAMES/SURVEILLANCE REPORT |
| INVESTIGATION MADE AT | : | CHICAGO, IL |
| INVESTIGATION MADE BY | : | SA DANIEL DICK |
| REPORT MADE BY | : | SA DANIEL DICK |
| PERIOD COVERED | : | 3/21/02 |
| DATE OF REPORT | : | 4/2/02 |
| APPROVED BY | : | SAIC ARNETTE F. HEINTZE |
| DISTRIBUTION | : | CHICAGO  -  ORIGINAL & 1CC |
| | | CFT  -  1CC |
| | | ISD  -  1CC |

SYNOPSIS:

ON 3/21/02, AGENTS OF THE CHICAGO FIELD OFFICE AND FBI CONDUCTED A
SURVEILLANCE OPERATION ON DONVILLE JAMES AND A FBI CONTROLLED CI. THE
FOLLOWING AGENTS PARTICIPATED IN THE OPERATION:  SA DEPODESTA AND SA
VOETTINER OF THE FBI, SA NEWBERG, MYSELF, SA FIELD, SA ANDERSEN,
SA KALDIS, SA BLISICK, SA ECK, AND SA STUTE.

INTRODUCTION:

REFERENCE IS MADE TO THE NOTIFICATION OF PLANT SUPPRESSION/ FEDERAL ARREST
OF JAMES AND ADDISON TELETYPE DATED 3/28/02.

DETAILS OF INVESTIGATION:

| DATE | TIME | ACTIVITY |
|---|---|---|
| 3/21/02 | 1300 | SECRET SERVICE AND FBI AGENTS MEET AT A PARKING LOT LOCATED AT LAKE ST. AND HALSTED ST. FOR OPERATION BRIEFING.  SA'S ARE INTRODUCED TO CI. |

0045

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**


Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendants.                )
_____  )


EXHIBITS "3"

FD-515 (Rev. 8-1-00)

Squad supervisor approval
*84/DV* (please initial)

**Accomplishment Report**
(Accomplishment must be reported and loaded into ISRAA within 30 days from date of accomplishment)

Date Prepared 4/25/02
Date Loaded 5/1/02
Data Loader's Initials _9mu_

| Accomplishment involves: (check all that apply) | |
|---|---|
| Drugs | ☒ |
| A Fugitive | ☐ |
| Bankruptcy Fraud | ☐ |
| Computer Fraud/Abuse | ☐ |
| Corruption of Public Officials | ☐ |
| Money Laundering | ☐ |
| Sub invest Asst by FO (s) | ☐ |

File Number
28K-CG-117362

Stat Agent Soc. Sec. No.

Stat Agent Name

| RA | Squad |
|---|---|
| | D-1 |

Asst. FO(s) __, __, __, __
A, B, C, D

Task Force

Assisting Agencies x •
1. DSSS
2.

RA
Assisting Agents Soc. Sec. No. ×

Name:
2.

Name:

b6
b7C
b7E
b2
b7E

**Investigative Assistance or Technique Used**
1 - Used, but did not help          3 - Helped, substantially
2 - Helped, minimally               4 - Absolutely essential
For Sub. Invest. Assist. by other FO (s) indicate A,B,C,D for corresponding FO

| IAT | Rate FO | IAT | Rate FO | IAT | Rate FO | IAT | Rate FO |
|---|---|---|---|---|---|---|---|
| Fin. Analyst | | Lab. Div. Exam | | UCO - Group I | | Ft. Mon- | |
| Aircraft Asst. | | Lab. Field Sup | | UCO - Group II | | For. Lang | |
| Computer | | Pen Registers | | UCO - Nat. Back | | Non FBI Lav cx | |
| Consen Mon. | | Photo Cover. | | NCAVC / VI - C | | Vict-Witn Coor | |
| Elsur / FISC | | Polygraph | | Crim/NS Intel | | IO Wanted Flyer | |
| Elsur / T. III | | Search Warran | | Crisis Neg. - Fed | | SARs | |
| Eng. Field Spt. | | Show Money | | Crisis Neg. - Loca | | CART | |
| Eng. Tape Ex | | SOG Asst. | | ERT Asst. | | | |
| Legats Asst. | | Swat Team | | Butte - ITC | | | |
| Evid Purchase | | Tech. Ag/Equip | | Sav - ITC | | | |
| Int/CW Info | | Phone Toll Rec | | Poc - ITC | | | |

**A.** (Complaint) / Information / (Indictment)
☒ Federal  ☐ Local  ☐ International
Complaint Date: 3/25/02
Check if Civil Rico Complaint ☐
Information Date: _____
Indictment Date: 4/11/02

**B.** Locate / (Arrest)
☒ Federal  ☐ Local  ☐ International
Subject Priority: ☐ A  ☐ B  ☒ C
Locate Date: _____
Arrest Date: 3/25/02
☐ Subject Resisted Arrest
☒ Subject Arrested was Armed

**C.** Summons Date: _____
☐ Federal  ☐ Local

**D.** Recovery/Restitution/PELP X
☐ Federal  ☐ Local  ☐ International
Recovery Date: _____
Code • _____ ✓ Amount $_____
Code • _____ ✓ Amount $_____
Restitution Date: _____
☐ Court Ordered  ☐ Pretrial Diversion
Code • _____ ✓ Amount $_____
PELP Date: _____
Code • _____ ✓ Amount $_____

**E.** Hostage(s) Released Date: _____
Released by: ☐ Terrorist ☐ Other
Number of Hostages: _____
Child Located Date: _____

**F.** Conviction
☐ Federal  ☐ Local  ☐ International
Conviction Date: _____
Subject Description Code: _____ • (_____) •
For 6F, G, H-Include Agency Code
☐ Felony  or  ☐ Misdemeanor
☐ Plea  or  ☐ Trial
State: _____ Judicial District: _____

**G.** U.S. Code Violation
Required for sections A,B,F, and J
(Federal Only)

| Title | Section | # Counts |
|---|---|---|
| 21 | 846 | 1 |
| 18 | 924(c) | 1 |
| 18 | 473 | 1 |
| 18 | 471 | 1 |

**H.** Sentence Date: _____
Sentence Type: _____, _____, _____ •
In Jail:      Years_____ Months _____
Suspended: Years_____ Months _____
Probation:  Years_____ Months _____
Fines:      $_____

**I.** Disruption/Dismantlement:
Disruption Date: _____
Dismantlement Date: _____
Completion of FD-515a Side 2 **Mandatory**

**J.** Civil Rico Matters  Date: _____
Also Complete "Section G"
Other Civil Matters Date: _____
Judgment ____ ____ ____ •
Judicial Outcome ____ ____ ____ •x
Amount $_____
Suspension: Years _____ Months _____

**K.** Administrative Sanction Date: _____
Subject Description Code _____ •
Type:      Length:
☐ Suspension  ☐ Permanent
☐ Debarment      or
☐ Injunction  Year_____ Months _____

**L.** Asset Seizure Date: _____
Asset Forfeiture Date: _____
CATS #  Mandatory _____
Check one of the three:
☐ Asset Forfeiture - Administrative
☐ Asset Forfeiture - Civil Judicial
☐ Asset Forfeiture - Criminal
Do not indicate $ value in Section D

**M.** Acquittal / Dismissal / Pretrial Diversion
Acquittal Date: _____
Dismissal Date: _____
Pretrial Diversion Date: _____

**N.** Subject Information (Required for all Sections excluding Section D (Recovery/PELP), Section E (Hostage), Section I, and Section L).

| Name | Race • | Sex | Date of Birth | Social Security No. (if available) |
|---|---|---|---|---|
| Donville James | B | M | 11/24/70 | 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 |

For Indictments/Convictions only:
☐ Subject related to an LCN, Asian Organized Crime (AOC), Italian Organized Crime (IOC), Russian/Eastern European, Caribbean, or Nigerian Organized Crime Group - Complete FD-515a, Side 1 Blocks A-E mandatory, F-H as appropriate.
☒ Subject related to an OC/Drug Organization, a VCMO Program National Gang Strategy target group, or a VCMO Program National Priority Initiative target group - Complete FD-515a, Side 1 Blocks A-C only.

x  Additional information may be added by attaching another form or a plain sheet of paper for additional entries.
•  See codes on reverse side.
✓  Requires that an explanation be attached and loaded into ISRAA for recovery over $1m and PELP over $5m.

Serial No. of FD-515
53

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendants.                )
_____   )


EXHIBITS "4"

3

1                          ALLAN DUBON,

2     having entered the Grand Jury room, was sworn by the

3     Foreperson as follows:

4                THE FOREPERSON:  You do solemnly swear that

5     in the testimony you are about to give before this Grand

6     Jury you will speak the truth, the whole truth and

7     nothing but the truth, so help you God.

8                THE WITNESS:  Yes.

9                THE FOREPERSON:  Please be seated

10                          EXAMINATION

11    BY MS. HAYS:

12        Q     Could you state your name and spell your

13    first and last name for the record.

14        A     Allan Dubon, A-l-l-a-n, D-u-b-o-n.

15        Q     Allan, did you meet with me yesterday and

16    give me a statement regarding the circumstances

17    surrounding the investigation of Donaville James?

18        A     Yes.

19        Q     And did you meet with me again today before

20    we came in here?

21        A     Yes.

22        Q     And did I give you a statement that reflected

23    what you told me the day before?

24        A     Yes.

25        Q     And did you read that statement carefully?

4

1    A    Yes.

2    Q    And is everything in that statement true and

3    correct and based on what you told me?

4    A    Yes.

5    Q    Could you read the statement.

6    A         "I agreed to help the FBI in an

7         undercover investigation in around February

8         2001 several weeks after I placed my last

9         call to James asking him to pay me back.  He

10        called me.  He had a way for me to make back

11        some of my money I needed.  He say he would

12        pay me if I would arrange for him to buy

13        narcotics from my source using counterfeit

14        money.    *Where is FBI Report for Feb*

15             "I provided the FBI with this

16        information and I agreed to work undercover

17        in the investigation of James.  I told James

18        I was interested in his offer.  He then

19        called me numerous times and continued to

20        increase the amount of drugs he wanted and

21        the amount of counterfeit money he will

22        provide.

23             "On March 16, 2001, James called me

24        and we agreed that he would purchase 1 kilo

25        of cocaine from my source for $20,000 in

0061

5

1   counterfeit currency and he would give me

2   $10,000 in real currency.

3        "On March 21, 2002, we agreed that

4   James would purchase 10 kilos of cocaine from

5   my source for $200,000 in counterfeit money.

6   On March 22nd, 2002, James called me and

7   asked whether he could buy 20 kilograms

8   from my source.  I told him I will have to

9   see whether my source had 20 kilograms

10  available.

11       "On March 24, 2002, James and I

12  agreed that he will purchase 15 kilograms

13  from my source and pay 300,000 in counterfeit

14  currency.  He told me he would pay me 20,000

15  in real currency for arranging that

16  transaction.

17       "On March 25th, 2002, James and I

18  met in McDonald's parking lot to further

19  discuss the conduct of that transaction.

20  When James arrived he told me to get in his

21  car so he could drive me to an open -- drive

22  me to where he was keeping the counterfeit

23  money.  He drove to a park nearby.  James

24  opened the trunk and showed me a bag of

25  counterfeit money.  He said 300,000 was

0062

6

1  inside the bag.

2        "We then drove back from McDonald's.

3  I told him the 15 kilograms of cocaine was

4  scattered in several nearby parked cars and

5  that I was going to get the first 5 kilograms

6  of cocaine.  When I returned with what was

7  actually that FBI's artificial cocaine, James

8  told me he would give me the counterfeit

9  money once I brought him the second 5

10  kilograms of cocaine.

11        "He also said to me something to the

12  effect of, 'I won't have to use my gun then,

13  right?'  I responded, `no.'  I left to get

14  the second 5 kilograms of cocaine.  After I

15  left James was arrested."

16        MS. HAYS:  All right.  Any questions before

17  we call the agent in to give you more background and

18  details about the case?

19        (No response.)

20        MS. HAYS:  Okay.

21        (Witness excused.)

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
          Plaintiff,               )
                                   )
          v.                       )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
          Defendants.              )
_____  )

EXHIBITS "5"

FD-302 (Rev. 10-6-95)

EXHIBIT "A"

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/02/2002

A Source, who is in a position to testify, provided the following information:  (Also present during the interview were Assistant United States Attorneys (AUSA) VALERIE HAYS and PATRICK COLLINS of the United States Attorney's Office, Northern District of Illinois.  As Spanish is the native language of the Source, the United States Attorney's Office provided a Spanish speaking interpreter, ROBERTO MENDOZA who translated the interview from the English language to the Spanish language and from the Spanish Language to the English language).

Source first came to the United States in the company of his Mother and four Sister's approximately fifteen years ago from Guatemala.  Source entered the United States lawfully and is a legal Resident Alien.  Source lived in the Chicago, Illinois area for approximately thirteen years, moving around between the North side and the South side of Chicago however, lived predominately in the South side.  Source completed his Junior year in High School, however dropped out due to his girlfriend becoming pregnant and his need to seek employment.  Source started working for temporary employment agencies until approximately four years ago where he gained employment from OLAN INDUSTRIES in Northbrook, Illinois as an assistant supervisor over the warehouse.  In September of 2001, the Source was laid off from that job and has been unemployed ever since.

In mid to late 1999, the Source first became involved in selling narcotics.  Source was frequenting a bar in the area of Fullerton and Linder in Chicago, Illinois.  Source was a casual user of powder cocaine, using the drug on weekends when he would drink at the bar and would purchase small quantities of cocaine from customers within the bar.  After observing others selling the drug, the Source came up with the idea that he could also make some money selling small quantities of cocaine and purchased an "eight ball" or an eight of an ounce to break down into ten dollar ($10.00) quantities.  Source purchased the "eight ball" from a customer in the bar and sold the cocaine, which he broke down into smaller quantities at home, to other customers in the bar.  Source recalled purchasing "eight balls" approximately four times between 1999 and 2001.

---

Investigation on    08/28/2002    at  Chicago, Illinois

File #  270F-CG-117142-A; 281C-CG-117362-BC1        Date dictated    09/02/2002

by    Frank Jack Sodetz III:fjs

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;    0136

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of ____Source_____, On __08/28/2002__, Page __2__

     Source became acquainted with other individuals from the bar who dealt in larger quantities of cocaine and became friends with them. Source realized he could make more money by brokering, or acting as the middleman, for larger cocaine deals between customers and his friends. Source then began to introduce customers for larger quantities of cocaine to his friends at the bar for which he would be paid a fee ranging from $150.00 to $1,000.00. The first deal he recalled brokering was for one half a kilogram of cocaine. Then from 1999 to mid 2001, the Source brokered between eight (8) and nine (9) deals for one kilogram of cocaine at a time to various customers. The Source recalled that the price for a kilogram of cocaine ranged from $20,500.00 to $22,000.00 per kilogram.

     During this period, the Source also brokered three marijuana deals with the same suppliers as the cocaine. The first deal was for one (1) pound of marijuana with a customer he could not recall, the second was for ten (10) pounds of marijuana with an individual the Source knew as VINCENT HEARD and the last marijuana deal with an individual the Source knew as JAMES later identified as DONVILLE JAMES for nighty eight (98) pounds. It was during this deal, in the Summer of 2001, that JAMES paid the Source for the marijuana in counterfeit United States currency.

     The Source recalled brokering three cocaine deals with JAMES between the Summer of 2000 and the Summer of 2001. The Source met JAMES through a co-worker at OLAN INDUSTRIES named Derrick who in turn introduced the Source to an individual Derrick referred to as his cousin Josh. Derrick introduced Josh to the Source for the purpose of brokering a one (1) Kilogram cocaine deal. Derrick was described as a black male, 5'4" tall, very thin build, approximately 40 to 50 years old. Josh was described as a black male, heavy set, with gold or silver teeth, 20 to 35 years old, with a Jamaican accent. When Josh showed up at the parking lot of OLAN INDUSTRIES to negotiate the deal with the Source, he brought JAMES with him and introduced JAMES as a friend and partner. The Source, Josh and JAMES agreed to a price of $21,000.00 for the kilogram of cocaine during that meeting.

     The Source approached two individuals he knew as Joe and David to obtain the kilogram of cocaine. The Source did not have money to purchase the kilogram of cocaine and asked Joe and David to front it to him. Since Joe and David did not know Josh and JAMES, they refused to front the kilogram of cocaine and required to be present during the deal. On the day the deal was conducted,

0137

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____Source_____ , On __08/28/2002__ , Page ___3___

the Source met JAMES and Josh at a JEWEL/OSCO parking lot at
Lawrence and Central in Chicago, Illinois.  JAMES was driving an
older, brown in color, NISSAN automobile and Josh was in a stretch
limousine, dark grey or black in color.  Josh, JAMES and the Source
then entered the back of the limo and the Source was shown the
money.  Once the Source was satisfied the money was okay, the
Source directed Josh in the Limo and JAMES in his brown NISSAN to
follow the Source to his residence located just three blocks away
on Central.  The Source recalled that JAMES had a black female with
him which he referred to as his girlfriend in the car.  When they
arrived at the Source's residence, the limo parked in front of the
house, while JAMES and his girlfriend parked on the street.  While
waiting for Joe and David to arrive with the kilogram of cocaine,
the Source, JAMES and his girlfriend talked outside in front of the
house.  JAMES's girlfriend saw a small dog the Source had and asked
the Source about purchasing it from him.  A short time later, Joe
and David arrived with the kilogram of cocaine and Joe, David,
JAMES and the source went into the Source's house.  JAMES placed
the money for the cocaine on the kitchen table, while Joe and David
placed the kilogram of cocaine on the table.  Once Joe and David
counted the money, the kilogram of cocaine was given to JAMES who
departed the residence.  The Source said he made $500.00 for
brokering that deal.

        Less than one month later, JAMES contacted the Source and
said the kilogram of cocaine had been good and wanted to purchase
another one.  The Source contacted Joe and David and set the deal
up.  The Source directed JAMES to David's residence in the area of
Damon and Cicero in Chicago, Illinois.  JAMES arrived at the
residence alone, driving the brown NISSAN, parking the car in the
garage at the residence.  JAMES entered David's house, showed the
money and was given a kilogram of cocaine by David.  After JAMES
departed the house with the kilo, the Source, Joe and David counted
the money provided by JAMES and discovered the money was $500.00
short.  The Source then called JAMES to tell him the money was
short, and JAMES agreed to meet the Source the next day to pay the
difference.  The following day, the Source met JAMES on a street
corner and JAMES paid the Source the $500.00 which the Source kept
as his profit for brokering the deal.

        Approximately three to five days later, JAMES contacted
the Source and told him the kilogram of cocaine he had purchased
was bad and that he wanted to return it.  The Source argued with
JAMES that the day of the deal, JAMES had told the Source the
kilogram of cocaine had been good and at that time, there had been

0138

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____ Source _____ , On 08/28/2002 , Page 4

no problem.  JAMES told the Source that the guy he had provided the
kilogram of cocaine to was having problems cooking it (converting
it to crack cocaine) and he wanted to return it as Joe and David
had guaranteed it was good.  JAMES told the Source that the guy he
provided the kilogram of cocaine to refused to pay him for it so
JAMES was forced to beat the guy up and take his car until the
situation could be resolved.  The Source then contacted Joe and
David who told the Source to have JAMES bring the kilogram of
cocaine to the Source's residence where they would all meet and
check the kilogram of cocaine.  The next day, JAMES, Joe, David and
the Source met at the Source's residence, at which time JAMES
produced the kilogram of cocaine.  The kilo had been broken down
and was now in four separate packages, three bags and the original
wrapper.  JAMES told Joe and David that his customer did not like
the quality of the cocaine and was having problems cooking it, and
that he (JAMES) wanted a new kilo.  Initially David and Joe refused
to exchange the kilo, however the Source told them that he did not
want to have problems with JAMES and that JAMES had made threats to
the Source about the incident.  David and Joe then agreed to
exchange the kilo and provided a new kilogram of cocaine to JAMES.
David and Joe told the Source they would take the kilo returned by
JAMES and break it down into ounces for sale to recover the money.

Sometime in early Summer of 2001, JAMES contacted the
Source and wanted to purchase another kilogram of cocaine.  The
Source contacted David and Joe who told the Source they did not
have any kilograms of cocaine available.  The Source then contacted
another source of supply named Tonio who told the Source he could
provide the kilogram of cocaine.  The Source then contacted JAMES
and let him know he could provide the cocaine and for JAMES to call
him when he was ready with the money.  Two to three days later
JAMES contacted the Source and said he was ready to do the deal.
The Source then met JAMES at a WENDY's restaurant parking lot
located at Kimball and Belmont in Chicago, Illinois.  When the
Source arrived at the parking lot, he observed JAMES on a
motorcycle parked next to a car occupied by a black male, and that
the two were talking as though they were together.  When the Source
approached JAMES, the car driven by the black male departed.  The
Source told JAMES that they would do the deal at Tonio's house a
few blocks away.  At first JAMES did not want to go to the house,
however the Source assured him that there would be no problems and
for JAMES to follow him to the house.  JAMES followed the Source on
the motorcycle while the Source drove his car to Tonio's residence
on Avers.  When they arrived at the house, the Source parked on the
street in front of the house, while JAMES parked in the rear of the

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____Source_____, On __08/28/2002__, Page ___5___

house.  JAMES then removed a tube, the shape of a PRINGLES brand
potato chip can, from the motorcycle which contained the money for
the cocaine.  JAMES, the Source, Tonio and Tonio's brother then
went inside the house, where JAMES provided the money to Tonio and
Tonio provided the kilogram of cocaine to JAMES.  At the conclusion
of the deal, JAMES asked the Source to follow him out of the
neighborhood to provide security to him as he did not know the area
and was afraid of the police.  The Source then followed JAMES (the
Source in his car, JAMES on his motorcycle) back to the area of the
WENDY's restaurant.

     In June of 2001, while working at OLAN INDUSTRIES, the
Source met a co-worker, a black male named Bryan, later identified
as BRYAN KIRKWOOD who said he knew an individual, a black male
named Robert, later identified as KENNETH CARROLL who wanted to buy
quantities of powder cocaine.  The Source, KIRKWOOD and CARROLL
conducted four deals together, each for a kilogram of cocaine
supplied by Joe and David.  In late June, 2001, KIRKWOOD and
CARROLL contacted the Source and requested to purchase a quarter
kilogram of cocaine (four and one half ounces).  The Source,
KIRKWOOD and CARROLL agreed to do the deal on a Friday in the
parking lot of OLAN INDUSTRIES.  When KIRKWOOD and CARROLL arrived
to do the deal, the Source exited OLAN INDUSTRIES with the drugs
and entered a car driven by KIRKWOOD and CARROLL.  Once in the car,
CARROLL placed a gun to the side of the Source and KIRKWOOD and
CARROLL stole the cocaine, the Source's cellular telephone, and the
Source's car keys and forced the Source from the vehicle.  The
Source then contacted the NORTHBROOK POLICE DEPARTMENT via 911 and
reported he was robbed.  The police located CARROLL and KIRKWOOD
and in the ensuing investigation it was determined that the reason
for the robbery was a drug deal at which time the Source was
arrested.

     The Source bonded out of jail and contacted David and Joe
to obtain money for a lawyer for his case.  David and Joe refused
to provide the money for the lawyer and in addition, told the
Source he was responsible to them for the quarter kilogram of
cocaine lost in the robbery.  The Source then contacted Tonio for
assistance and was told that the best way to make money for a
lawyer was to bring more customers for narcotics to him.  The
Source then contacted JAMES and asked if JAMES needed anything.
JAMES told the Source he was aware he had been arrested and asked
if everything was okay.  The Source told JAMES he needed to make
money to pay for a lawyer.  JAMES asked the Source if he could get
him one hundred and fifty (150) pounds of marijuana.  Source then

01140

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____ **Source** _____ , On __08/28/2002__ , Page ___6___

contacted Tonio to see if he could obtain the drugs. Tonio then called around and was able to obtain approximately ninety eight (98) pounds of marijuana from suppliers named Jorge and Primo. The Source was to make $4,000.00 on the deal.

The Source then contacted JAMES and said he could only obtain the ninety eight (98) pounds of marijuana and asked JAMES if he still wanted to do the deal. JAMES agreed and the deal was set up for later that afternoon for a price of sixty eight thousand dollars ($68,000.00). The Source then went to Tonio's house, met with Jorge, Primo and Tonio, and waited for the marijuana to arrive at the house. A short time later, a car arrived with a large suitcase in the trunk containing the marijuana. The suitcase was then removed from the car and placed in the house. The Source then called JAMES and told him the drugs had arrived and they were ready to do the deal.

A short time later, JAMES contacted the Source and told him he was at the WALLGREEN's parking lot at Diversey and Pulaski. The Source then drive to the parking lot to meet with JAMES. JAMES was next to his brown NISSAN and told the Source he had locked the keys in the car and that the money was also in the car. Also in the parking lot was a black in color LINCOLN CONTINENTAL with Livery plates driven by a light skinned male, heavy set, tall, with a mustache. The Source thought he was either Hispanic or American. The Source said he was told by Tonio to check and see if the money was okay, but by the time JAMES was able to open the car, the Source was concerned about how much time had go by. The Source told JAMES he would trust him and did not need to see the money. The Source then parked his car around the block and got into the LINCOLN, sitting in the front with the driver. JAMES then follows in his car as the Source directed the driver of the LINCOLN towards Tonio's house. Approximately one block away from Tonio's house, the LINCOLN driver received a cell phone call from JAMES. At the end of that call, the LINCOLN driver told the Source that they were going to return to the Source's car and pick it up. The LINCOLN driver then drove back to the Source's car, dropped the Source off, and the Source then drove to Tonio's house with JAMES (driving his NISSAN) and the LINCOLN following.

When the Source arrived at Tonio's house, the LINCOLN double parked on the street directly in front of the residence. JAMES parked on the corner, and the Source parked on the street nearby. The Source then went inside of Tonio's house while JAMES and the LINCOLN driver remained outside in the respective cars.

0141

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____Source_____ . On __08/28/2002__ . Page ___7___

The Source then argued with Tonio over who would deliver the
suitcase of marijuana to the LINCOLN and who would collect the
money from JAMES.  It was agreed that Tonio would collect the money
from JAMES and the Source would deliver the suitcase.  Tonio's
brother then helped the Source load the suitcase on his shoulder
while Tonio went to JAMES's vehicle.  Once the Source placed the
suitcase into the trunk of the LINCOLN, JAMES handed a black bag to
Tonio through he car window.  The LINCOLN driven by the white male,
and the NISSAN driven by JAMES then departed and the Source and
Tonio went inside Tonio's residence to check the money.

Once the Source and Tonio were inside, they check the
money and determine the money was fake, consisting of $100.00 and
$20.00 counterfeit bills.  Tonio then called Jorge and Primo to
tell them there was a problem while the Source called JAMES.  JAMES
answered the phone and the Source told him the money was bad.
JAMES told the Source that the driver of the LINCOLN must have been
responsible for the rip off.  A few days later, the Source
contacted JAMES on his cellular telephone again to discuss the rip
off.  During that conversation, the Source and JAMES argued over
the deal, at which time JAMES told the Source that if the Source
wanted, he could attempt to locate him and he and the Source could
fight it out and they would see who killed who.  After that
conversation, JAMES would not answer his phone when the Source
called.

As a result of the deal with JAMES going bad, Jorge and
Primo held the Source responsible for the loss and began to
pressure him for the money.  Sometime in September or October,
Jorge and Primo called the Source to a meeting at a park located at
Narraganset and Fullerton where approximately six Hispanic males
were waiting.  Jorge and Primo set a deadline for the Source to
come up with the money or else he or his family would be harmed.

Source was not able to reach JAMES on his cellular
telephone, and was desperate to speak to him.  Source was aware of
an individual named David who worked for PRIMECO who for $1,000.00,
could obtain telephone numbers and addresses for people.  Source
then borrowed $500.00 from a friend and convinced David to provide
a telephone number as well as an address for JAMES and that the
Source would pay David the remaining $500.00 later.  David then
gave the Source a cellular telephone number that was supposed to be
used by JAMES and an address for TOMIKA ADDISON, the subscriber of
the phone.  The Source then spent approximately one week going by
the house at all hours of the day and night in an attempt to locate

0142

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____ Source _____ , On _08/28/2002_ , Page ___8___

JAMES, without success.  In addition, the Source called the number
provided to him by David and was able to reach JAMES.  After
repeated telephone calls to JAMES, JAMES finally agreed to help the
Source with the situation with Jorge and Primo by providing either
all or at least some of the money owed.

    JAMES told the Source that the marijuana he stole from
the Source was of poor quality and that had he paid for the
marijuana as they had agreed, he would have been out of the money
because the drugs would not have been of a good enough quality to
sell.  The Source continued to call JAMES, a begged him to pay some
amount of money, even if it was only $5,000.00 to $10,000.00
because Jorge and Primo were on his back over the debt.  The Source
told JAMES that Jorge and Primo had threatened him and his family
over the debt, and told JAMES that if anything was to happen to his
family, then he would do something in return to JAMES.  On several
occasions JAMES suggested that he could provide the Source with
counterfeit money that the Source could use to rip off drugs from a
dealer, then the Source could sell the drugs for cash to pay off
his debt.  The Source recalled calling JAMES from several telephones
including (773) 580-7585, (312) 286-5618 and (773) 255-0485.

    Source then approached several Chicago Police Department
(CPD) Officers who were friends of his sister.  These officers in
turn introduced the Source to a Drug Enforcement Administration
(DEA) Agent who told the Source that due to his pending state
narcotics case, the DEA would not be willing to work with him.  It
was at that time, in November of 2001, that the Source walked into
the offices of the FBI in Chicago and asked to speak with Agents.

    Source related that just prior to approaching the FBI, he
spoke with a friend named GUADALUPE OVALLE, whom the Source knew to
be involved in selling both cocaine and marijuana.  The Source
asked OVALLE if he could obtain between five and seven kilograms of
cocaine and entered into negotiations with both OVALLE and his
supplier to conduct the deal.  The Source explained that he felt
that he needed to have a couple of cases lined up with people he
knew were involved in drug trafficking in order to convince the FBI
to work with him.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                        )
                                       )
          Plaintiff,                   )
                                       )
          v.                           )     Civ. No. 06-1951(GK)
                                       )
United States Secret Service,          )
Federal Bureau of Investigation,)
Department of Justice,                 )
                                       )
          Defendants.                  )
_____)

EXHIBITS "6"

EXHIBIT    "B" "A"

I agreed to help the FBI in undercover investigations. In or around February 2001, several weeks after I placed my last call to James asking him to pay me back, he called me. He said he had a way for me to make back some of the money I needed. He said he would pay me if I would arrange for him to buy narcotics from my source, using counterfeit money. I provided the FBI with this information and agreed to work undercover in an investigation of James. I told James I was interested in his offer. He then called me numerous times and continued to increase the amount of drugs he wanted and the amount of counterfeit money he would provide. On March 16, 2001, James called me and we agreed that he would purchase 1 kilogram of cocaine from my source for $20,000 in counterfeit currency and $10,000 in real currency. On March 21, 2002, we agreed that James would purchase 10 kilograms of cocaine from my source for $200,000 in counterfeit currency. On March 22, 2001, James called me and asked whether he could buy 20 kilograms from my source. I told him I would have to see whether my source had 20 kilograms available. On March 24, 2002, James and I agreed that he would purchase 15 kilograms from my source and pay $300,000 in counterfeit currency. He told me he would pay me $20,000 in real currency for arranging the transaction.

On March 25, 2002, James and I met in a McDonald's parking lot to further discuss and conduct the transaction. When James arrived, he told me to get in his car so he could drive me to where he was keeping the counterfeit money. We drove to a Nissan Ultima parked nearby. James opened the trunk and showed me a bag of counterfeit money. He said $300,000 was inside the bag. We then drove back to McDonalds. I told him the 15 kilograms of cocaine was scattered in several nearby parked cars and that I was going to get the first 5 kilograms of cocaine. When I returned with what was actually the FBI's artificial cocaine, James told me he would give me the counterfeit money once I brought him the second five kilograms of cocaine. He also said to me something to the effect of "I won't have to use my gun then, right?" I responded "No" and left to get the second five kilograms of cocaine. After I left, James was arrested.

0658

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                          )
                                         )
          Plaintiff,                     )
                                         )
          v.                             )          Civ. No. 06-1951(GK)
                                         )
United States Secret Service,            )
Federal Bureau of Investigation,)
Department of Justice,                   )
                                         )
          Defendants.                    )
_____)

EXHIBITS "7"

AUSA Valarie Hays (312) 353-5356

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAMES DONVILLE

**CRIMINAL COMPLAINT**

CASE NUMBER:

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about March 25, 2002 in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendant did

> knowingly attempt to possess with intent to distribute approximately 15 kilograms of cocaine, a Schedule II narcotic drug controlled substance,

in violation of Title <u>21</u> United States Code, <u>Section 846</u>.

I further state that I am a <u>Special Agent of the United States Federal Bureau of Investigation</u> and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  <u>X</u> Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>March 25, 2002</u>
Date

at   <u>Chicago, Illinois</u>
City and State

<u>SIDNEY I. SCHENKIER, MAGISTRATE JUDGE</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

0049

STATE OF ILLINOIS    )
                     )    SS
COUNTY OF COOK .     )

## AFFIDAVIT

I, Frank DePodesta, being duly sworn under oath, state as follows:

1.    I am a Special Agent (S/A) of the United States Federal Bureau of Investigation. I have been employed as a FBI agent since July 1995. As part of my regular duties, I have investigated many drug trafficking organizations, arrested narcotics violators, managed the activities of confidential informants(CI), and seized narcotics and the proceeds from illegal narcotic sales.  In connection with this assignment, I am charged with, among other things, investigating violations of the Controlled Substances Act, Title 21, United States Code.

2.    I have participated in the investigation of the offense described below and have briefed other law enforcement officers on the progress thereof.  As a result, I am familiar with many aspects of the investigation, although I did not personally participate in every aspect.  I have also relied upon information related to me by other law enforcement officers, including officers from the United States Secret Service.  On the basis of this information, I allege the facts contained herein to show there is probable cause to believe JAMES DONVILLE

1

00 50

did knowingly attempt to possess with intent to distribute approximately 15 kilograms of cocaine, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. § 846.

3.  These matters are set forth for the purpose of establishing probable cause with respect to the charge described in the attached criminal complaint.  Accordingly, this information is in summary form and does not represent all of the information of which I am aware relating to this investigation.

4.  In March 2002, a cooperating individual (CI) provided the FBI with information about an individual known to the CI as "James."  The CI explained that James asked if the CI would be willing to arrange a narcotics transaction in which James would pay for powder cocaine with counterfeit United States currency.

5.  The CI agreed to work with the FBI and Secret Service to do an undercover operation.  As part of this operation, the CI told James he knew a cocaine supplier who could provide them with powder cocaine.

6.  Through several phone conversations in March 2002, James and the CI discussed different quantities of powder cocaine to purchase using counterfeit currency.

2

0051

7. On March 21, 2002, the CI met James at an Amoco gas station located on West North Avenue and North Elston Avenue in Chicago. James was driving a 2002 red Monte Carlo Enterprise rental car. In this conversation, James and the CI agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source. The CI was equipped with a concealed recording device and a transmitting device allowing the surveillance agents to monitor their conversation.

8. By checking with Enterprise Rent-A-Car, the Secret Service determined defendant JAMES DONVILLE was listed as an additional driver on the car.

9. On March 22, 2002, Defendant JAMES DONVILLE asked the CI if he could obtain 20 kilograms of powder cocaine. The CI said he would call his supplier and see if 20 kilograms were available.

10. On March 24, 2002, the CI placed a recorded telephone call to Defendant JAMES DONVILLE. They agreed on purchasing 15 kilograms of powder cocaine for $300,000. Defendant JAMES DONVILLE advised that he would have $200,000 in counterfeit money.

3

0052

11.   On March 25, 2002, the CI and Jones had several telephone conversations in which they agreed to meet at the McDonalds restaurant in the Brick Yard Mall, at the corner of Diversey and Narragansett, in order to further discuss and conduct the transaction. At the meeting, the CI was equipped with a concealed recording device and a transmitting device allowing the surveillance agents to monitor their conversation.

12.   At approximately 11:00 am, the CI arrived at McDonalds.  Defendant JAMES DONVILLE arrived shortly after the CI arrived.  Defendant JAMES DONVILLE asked the CI to get into his car and told the CI he was going to take him to show him the counterfeit currency.

13.   Defendant JAMES DONVILLE drove the CI to a vehicle parked on North Narragansett near the McDonalds restaurant.  The CI and Defendant DONVILLE got out of James' vehicle and looked in the trunk of a Nissan Ultima driven by and registered to Tameka Addison.

14.   Defendant JAMES DONVILLE showed the CI a bag which contained a large amount of what appeared to be United States currency.  Donville said he paid $40,000 in real currency for

4

0053

the counterfeit currency and told the CI it was $300,000 in counterfeit currency.

15.    Defendant JAMES DONVILLE and the CI went back to the CI's vehicle at McDonalds.  The CI told Donville that he spoke with his supplier and the supplier had left the kilograms of cocaine scattered in multiple cars at unspecified nearby locations.  He told Donville he was going to get the first five kilograms of cocaine and that he would return shortly.

16.    When the CI was going to get the five kilograms, defendant DONVILLE called him on his cellular phone and said the CI could trust him with the five kilograms of cocaine.

17.       The CI retrieved a bag containing five fake kilograms from a government vehicle and returned to McDonalds.

18.       Defendant DONVILLE pulled behind the CI's vehicle, so the CI could put the cocaine in the trunk.  DONVILLE then pulled away from the CI's vehicle prior to the CI putting the cocaine in his trunk.  DONVILLE then called the CI on the telephone and said there was a white van in the parking lot that looked suspicious.  DONVILLE asked the CI to come to an adjacent parking lot and give him the cocaine.

5

0054

19. The CI drove to the adjacent parking lot, pulled up near DONVILLE'S car, exited his vehicle with the five kilograms of fake cocaine, and brought the cocaine to DONVILLE. The CI took one kilogram of cocaine out of the bag and handed it to him. DONVILLE said it looked OK and gave it back to the CI to put in the bag. The CI then put the five kilograms on the passenger seat of DONVILLE'S car.

20. DONVILLE retrieved another kilogram of cocaine from the bag, examined it, and placed it back in the bag. DONVILLE then told the CI that when the CI gets another five kilograms of cocaine he would give him the fake currency.

21. DONVILLE also stated, "I don't have to use my gun then, right?" The CI responded, "No" and walked away.

22. After the CI left, FBI and Secret Service agents pulled up behind the defendant's vehicle and he attempted to drive away before being stopped by another government vehicle.

23. At this point, DONVILLE was arrested. His car was searched. In the front passenger's seat, agents discovered the bag containing the five fake kilograms of cocaine. On the

6

0055

driver's side floorboard, agents discovered a loaded Smith and Wesson nine millimeter semi-automatic pistol.

24.    Defendant DONVILLE was advised of his rights by United States Secret Service agents.  He agreed to waive these rights and speak with the agents.  He confessed to his involvement in the crime discussed above.  He stated he planned to buy 15 kilograms of powder cocaine with counterfeit currency, keep some of the drugs himself, give some to the CI, and use the rest of the drugs to pay Gangster Disciples for the counterfeit currency that they provided to him.

25.    Based upon my experience and training, I believe that the aforementioned facts constitute probable cause to charge JAMES DONVILLE with violations of federal law, specifically including violations of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT

_____
Special Agent Frank DePodesta, Applicant
US Federal Bureau of Investigation

Sworn and Subscribed before me this 25th day of March, 2002.

Sidney I. Schenkier

7

0056

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )          Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,)
Department of Justice,             )
                                   )
        Defendants.                )
_____)


EXHIBITS "8"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )     No.  02 CR 278
              v.                  )     Judge Wayne R. Anderson
                                  )
DONVILLE JAMES                    )
                                  )

## MOTION FOR THE GOVERNMENT PROVIDE COPIES OF ALL AUDIO-TAPES CREATED IN THIS CASE

Defendant, DONVILLE JAMES, by his attorney, Anita Rivkin-Carothers, moves this Honorable Court for an order directing the government to provide to the defense, copies of all audiotapes created by the informant or the government in connection with this case.. In support thereof defendant offers the following:

1.      The government has provided the defense with transcripts of audiotapes created by the informant in this case. It is anticipated that the government will seek to offer these transcripts to assist the jury in listening to the tapes.

2.      The defense has not received copies of the audiotapes so that comparisons of what is contained on the government's transcripts can be compared with what is heard on the tapes.

3.      Further, the defense may not agree with the government's interpretation of what is heard on the tapes, and may wish to prepare his own transcripts  to assist the jury in listening to the tapes

0213

WHEREFORE, Mr. James requests the government be requires to provide copies of the audiotapes to defense counsel prior to trial.

Respectfully submitted,

_____
Attorney For Defendant

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
(312) 641-2901

2

0214

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                     )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )          Civ. No. 06-1951(GK)
                                    )
United States Secret Service,       )
Federal Bureau of Investigation,   )
Department of Justice,              )
                                    )
        Defendants.                 )
_____)

EXHIBITS "9"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  02 CR 278 |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

**MOTION FOR THE GOVERNMENT TO PRODUCE THE
MARCH 25, 2002 AUDIOTAPE AND TAPE RECORDER WHICH
"FAILED" FOR EXAMINATION BY DEFENDANT'S TAPE EXPERT**

Defendant, DONVILLE JAMES, by his attorney, Anita Rivkin-Carothers, moves

this Honorable Court for an order directing the government to produce the original

audiotape of March 25, 2002, and the tape recorder which "failed" for examination by

defendant's tape expert.  In support thereof defendant offers the following:

      1.     The government has stated that although its informant was wearing a

recording device and a transmitting device in conversation with Mr. James on March 25,

2002, that the conversation is not on tape because the tape recorder failed.

      2.     It is anticipated that the most damaging testimony the informant will offer

concerns conversations occurring when the tape recorder "failed".  Based on reports and

affidavits of the agent, and pleadings filed by the government, this "failed" tape would

have contained an alleged statement by Mr. James to the informant  "I don't have to use

my gun then, right".

      3.     Mr. James wished to have the tape and the recorder examined by an expert

to determine the probable cause of the tape "failing", and to offer an opinion on whether

the tape "failed"  due to mechanical problems or manipulation.

0215

WHEREFORE, Mr. James requests the government be requires to produce the original "failed" tape and tape recording device which failed for examination by defense tape expert.

Respectfully submitted,

_____
Attorney For Defendant

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
(312) 641-2901

2

0216

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
          Plaintiff,               )
                                   )
          v.                       )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
          Defendants.              )
_____    )

EXHIBITS "10"

RECEIVED

MAY 1 7 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 02 CR 0278 |
| v. | ) | Honorable Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

## NOTICE OF FILING

**BY U.S. MAIL**

TO:     Anita Rivkin-Carothers
        33 North LaSalle Street
        Chicago, Il 60602

PLEASE TAKE NOTICE that on Friday, May 17, 2002, the undersigned filed with the Clerk of this Court the following document in the above captioned case: **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT DONVILLE JAMES' PRETRIAL MOTIONS** and service of which is being made upon you.

Respectfully submitted

PATRICK J. FITZGERALD
United States Attorney

By:     _Valarie Hays_
        VALARIE HAYS
        Assistant U.S. Attorney

STATE OF ILLINOIS )
                 )        SS
COUNTY OF COOK    )

Laconda M. McDade, being first duly sworn on oath deposes and says that she is employed in the Office of the United States Attorney for the Northern District of Illinois; that on the 17th day of May 2002, she placed the foregoing Notice of the above-mentioned **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT DONVILLE JAMES' PRETRIAL MOTIONS** to be sent by **U.S. MAIL** delivered to the above named individual(s) on said date.

_Laconda McDade_

SUBSCRIBED AND SWORN TO BEFORE ME
this 17th day of May 2002.

_Barbara J. Sims_
NOTARY PUBLIC

"OFFICIAL SEAL"
Barbara J. Sims
Notary Public, State of Illinois
My Commission Exp. 05/21/2005

RECEIVED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAY 1 7 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. )    No.    02 CR 278
)    Hon. Wayne R. Anderson
)
DONVILLE JAMES )

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT DONVILLE JAME'S PRETRIAL MOTIONS

The United States of America, by its attorney, PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this consolidated response to

the following pretrial motions:  (1) Motion for Early Return of Trial Subpoenas; (2) Motion for

Disclosure and Impeachment Information; (3) Motion to Produce Telephone Number of the

Informant; (4) Motion to Quash Consent and Suppress Evidence; (5) Motion to Suppress Post-

Arrest Statements; (6) Motion for Fingerprint Examination; (7) Motion to Interview Government

Witnesses; (8) Motion for Copies of All Audiotapes; (9) Motion to Produce Tape Recorder

Which "Failed;" (10) Motion to Reset Trial Date.

## I.    BACKGROUND

In March 2002, the defendant approached a cooperating individual (CI) and asked if the

CI would be willing to arrange a narcotics transaction in which the defendant would pay for

powder cocaine with counterfeit United States currency.  The CI agreed to work with the FBI and

Secret Service to do an undercover operation.  As part of this operation, the CI told the defendant

he knew a cocaine supplier who could provide them with powder cocaine.

Through several recorded phone conversations in March 2002, the defendant and the CI discussed different quantities of powder cocaine to purchase using counterfeit currency. Specifically, on March 16, 2002, the defendant called the CI and they agreed that the defendant would provide $20,000 in counterfeit currency and $10,000 in real currency to buy one kilogram of cocaine from the CI's source. On March 21, 2002, the CI met the defendant and they agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source. The defendant said he would have to pay $40,000 in real currency for the counterfeit currency. On March 22, 2002, the defendant asked the CI if he could obtain 20 kilograms of powder cocaine. The CI said he would call his supplier and see if 20 kilograms were available. On March 24, 2002, the CI and the defendant agreed on purchasing 15 kilograms of powder cocaine for $300,000. The defendant advised that he would have $200,000 in counterfeit money for the CI's source and that the counterfeit money would look like $300,000.

On March 25, 2002, the CI and the defendant met in a McDonald's parking lot in order to further discuss and conduct the transaction. The defendant asked the CI to get into his car so he could take him to see the counterfeit currency. The defendant drove the CI to a vehicle parked nearby. The CI and the defendant got out of the defendant's vehicle and looked in the trunk of a Nissan Ultima driven by and registered to the defendant's girlfriend. The defendant showed the CI a bag inside the trunk that contained a large amount of counterfeit currency.

The defendant and the CI went back to the CI's vehicle at McDonalds. The CI told the defendant that he spoke with his supplier and the supplier had left the kilograms of cocaine scattered in multiple cars at unspecified nearby locations. He told the defendant he was going to get the first five kilograms of cocaine and that he would return shortly. The CI retrieved a bag

2

containing five kilograms of imitation cocaine from a government vehicle and returned to the defendant's car. After the defendant examined the cocaine and said it looked OK, the CI put the five kilograms on the passenger seat of the defendant's car. The defendant then told the CI that when the CI gets another five kilograms of cocaine he would give him the counterfeit currency. According to the CI, the defendant also stated, "I don't have to use my gun then, right?" The CI responded, "No" and walked away.

After the CI left, one FBI agent and three Secret Service agents pulled up in a car next to the defendant's vehicle. They got out of their car and approached the defendant's car yelling police. At this point, the defendant attempted to drive away. A second car with law enforcement officers attempted to stop the defendant's flight by hitting the defendant's fender with their own car. This did not stop the defendant. He turned his car and took off in the remaining unblocked direction. A third law enforcement car cut him off before he was able to drive out of the parking lot. After ordering the defendant out of his car, FBI and Secret Service agents arrested him and searched his car. In the front passenger's seat, agents discovered the bag containing the five kilograms of artificial cocaine. On the driver's side floorboard, agents discovered a loaded Smith and Wesson nine millimeter semi-automatic pistol.

The defendant was advised of his rights by United States Secret Service agents. He agreed to waive these rights and speak with the agents. He confessed in writing that he planned to buy 15 kilograms of powder cocaine with counterfeit currency and that he planned to give some of the drugs to a member of the Gangster Disciples. He also confessed to the interviewing agents that the gun found in his car belonged to him. A subsequent search of his residence uncovered various pieces of counterfeit-making equipment and counterfeit money. A search of

3

his girlfriend's car revealed $87, 430 in counterfeit currency. His girlfriend gave a written statement in which she admitted that she saw the defendant making counterfeit money in his apartment. She further admitted that the defendant told her he was going to make thousands of dollars by selling the counterfeit bills.

## II.      GOVERNMENT RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

### A.      Motion for Early Return of Trial Subpoenas

The government has no objection to early return of trial subpoenas as long as it is agreed that the subpoenaed material is shared with opposing counsel within a short time of receiving the material.

### B.      Motion for Disclosure and Impeachment Information

Defendant has filed a motion seeking disclosure of 23 categories of impeaching and exculpatory information, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Without addressing the propriety of the categories' scope and breadth, the government acknowledges its obligations under both *Brady* and *Giglio*.

The government understands that it has a continuing obligation under *Brady*, and should any *Brady* material exist, the government will disclose the material two weeks prior to trial. In addition, the government will honor its obligation to provide defendant with evidence bearing on witness credibility, pursuant to *Giglio*. The government does not object to providing all *Giglio* material in its possession two weeks prior to trial. The district courts in this Circuit "have repeatedly held that where the government has made assurances it will comply with *Brady* and *Giglio*, those assurances

4

are sufficient." *United States v. Butler*, No. 93 CR 720, 1994 WL 69387, at *2 (N.D. Ill. Feb. 4, 1994). *See also United States v. Dominguez*, 131 F.R.D. 556, 559 (N.D. Ill. 1990) (same).[1]

### C.    Motion to Produce the Telephone Number of the Informant

Defendant seeks the telephone number used by the informant to contact Mr. James. The informant's cell phone number at all relevant times was (312) 286-5618. The informant's home phone number at all relevant times was (773) 255-0485. The government will subpoena the informant's phone numbers as soon as this Court grants the agreed motion for early return of trial subpoenas. The government will provide defendant with a copy of those records within a day of receiving them.

### D.    Motion to Quash Consent to Search and Suppress Evidence and Motion to Suppress Post-Arrest Statements

Defendant asks this court to suppress the evidence found during the search of his apartment, specifically counterfeit-making equipment and counterfeit currency, and to suppress his post-arrest confession. Defendant claims he signed a consent to search form and made a written confession because he was subjected to "psychological coercion" and "promises of leniency." If this Court grants a suppression hearing to address defendant's contentions, the government will call William McKenna, the agent who took the defendant's confession and obtained the consent to search. Agent McKenna will testify that all of the allegations defendant makes in his suppression motions and supporting affidavit are false. The agent will further testify that no threats or promises were made to the defendant prior to him giving consent to search and signing a written confession. In addition,

---

[1]The government's acknowledgment of its obligations under *Brady* and *Giglio* should not be interpreted as a stipulation to provide defendant all of the materials requested in his motion for exculpatory evidence. Rather, the government will abide by the law in this Circuit and will provide defendant with all materials to which he is entitled.

agents explained the consent to search form to the defendant before he signed it. Agent McKenna will further testify that prior to giving a written confession, defendant was informed of his Miranda rights and he signed a waiver of those rights. There was absolutely nothing coercive about the defendant's confession or consent to search, and his claims to the contrary are merely a desperate attempt to suppress the overwhelming evidence in this case. Government counsel is available for a suppression hearing anytime during the week of June 3rd. If this Court determines a suppression hearing is warranted, the hearing should in no way delay the previously set June 10th trial date.

### E.    Motion for Fingerprint Examination of Evidence

The government has submitted the gun found in defendant's car for fingerprint analysis. The tests have just been completed, and the government will provide a copy of the results to defense counsel by the end of the week.

In regard to defendant's request for fingerprint analysis of the artificial cocaine, the government has no objection. The government will submit the cocaine for fingerprint analysis and will provide the results to defense counsel when they are complete. However, the government does not expect to find defendant's prints on the artificial cocaine. The cocaine was not preserved for fingerprint analysis and has in fact been used in numerous deals since the March 25th transaction at issue. In these subsequent deals, many agents, informants, and suspects have touched the drugs. Nevertheless, the government will submit the drugs for analysis and provide defense counsel with the test results as soon as they are finished.

6

**F.    Motion to Interview Witnesses Under Government's Control**

At this point, the government has not decided whether they will call the informant in this case as a witness. The government will make this decision within two weeks of trial. If the government decides to call this witness, the government certainly will not instruct the informant that he should not speak with defense counsel. The informant has been relocated because of his cooperation in another federal investigation. For the safety of the informant and his family, the government cannot disclose his current address. However, if the government decides to call the informant, the government will convey the defendant's request to the informant. If he chooses to speak with defense counsel, the government will arrange a telephone conference or a meeting at the U.S. attorney's office.

**G.    Motion for the Government to Provide Copies of All Audiotapes Created in This Case**

The government has just finished copying the tapes related to this case. Defendant's counsel will be receiving those tapes by the end of the week.

**H.    Motion for the Government to Produce the March 25, 2002 Audiotape and Tape Recorder Which "Failed" for Examination by Defendant's Tape Expert**

Defendant's request to examine the "tape recorder which failed" should be denied. The "tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD rom. When the conversations are recorded onto the CD rom, they are automatically erased from the digital recorder, and the CD rom itself becomes the evidence. The audiotapes that will be provided to defense counsel are dubbed from the CD rom. There is no reason to provide the actual recording equipment to the defense counsel because the equipment will provide no additional evidence. The

7

*(handwritten)* in good condition when he gave it to CI.

recorder "failed" at the time of the March 25th transaction at issue because it was not turned on. The agents involved in the case were testing the equipment prior to the transaction. In testing the equipment, they were turning it on and off. After testing the equipment, they left it off by mistake. There is no purpose that would be served by examining the equipment because the government is not claiming that there was a mechanical failure with the equipment. Moreover, turning the equipment over would reveal confidential methods of federal law enforcement investigation. Accordingly, defendant's request should be denied.

### I.    Motion to Reset the Trial Date

Defense counsel incorrectly asserts in the motion to postpone the trial that the trial is currently set for June 17th. The trial is in fact set for June 10, 2002. The conflict defense counsel alleges in the motion, namely another trial, pertains to June 17th. The government and defense counsel agree that this trial should not take longer than a week. Therefore, this trial will not interfere with defense counsel's conflict on June 17th. Defense counsel also mentioned to the government this morning that she has a continuing legal education class during the week of June 10th. Surely the training can be rescheduled more easily and with less adverse consequences than rescheduling the trial.

Under the special circumstances of this case, an extended trial date is not warranted. First, this is not a complicated case. The defendant admitted in writing to attempting to buy 15 kilograms of cocaine with counterfeit money. He further admitted that he had a gun in his car at the time of the transaction. The gun and the artificial cocaine were found in the defendant's car. Counterfeit-making equipment was found in his apartment. Defense counsel has known since at least the first

8

week of May that she was seeking permission to be appointed counsel for defendant. She has been provided with all required discovery material currently within the government's possession. She will be provided with the tapes, fingerprint results, and phone records as soon as the government obtains them, which should be very shortly (as discussed above).

This Court set an early non-negotiable trial date based in part on the government's and its own concerns regarding defendant's danger to the community while released on bond. Defense counsel informed the government that the next trial date this Court has available is in November. This gives the defendant over five more months to commit the same types of offenses for which he is currently charged. The fact that the government does not know of any offenses defendant has committed since he has been released does not alleviate the government's concerns. The government's position has always been that the type of offenses defendant might continue to commit while released on bond, namely drug and counterfeiting offenses, cannot be easily detected by the government and cannot be prevented by electronic surveillance. The government does not have the resources to monitor defendant's phone(s) and conduct surveillance outside his home on a regular basis. Defendant should have never been released based on the fact that he was involved in a 15 kilogram cocaine deal, brought a gun to the transaction, and threatened to use the gun. Defense counsel has more than enough time to prepare for trial and fails to allege any conflict that should be given a higher priority than this trial. The government respectfully requests that this court deny defendant's request for an extension of his trial date. Alternatively, the government requests that if this Court grants defendant's motion to extend the trial date, the defendant be detained pending trial. Defense counsel has indicated that the defendant would be willing to surrender to custody if necessary.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    VALARIE HAYS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5356

10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

Donville James,                          )
                                         )
          Plaintiff,                     )
                                         )
          v.                             )        Civ. No. 06-1951(GK)
                                         )
United States Secret Service,            )
Federal Bureau of Investigation,)
Department of Justice,                   )
                                         )
          Defendants.                    )
_____)

EXHIBITS "11"

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/28/2002

A source, who is in the position to testify, provided the following information:

The source, who previously agreed to participate in consensual recorded conversations, met with an individual known to the source as JAMES Last Name Unknown (LNU) at the MCDONALD'S RESTAURANT, located at the Intersection of West Diversey and North Narragansett, Chicago, Illinois, to conduct a narcotics transaction.

At approximately 10:10 a.m., the source telephonically contacted JAMES LNU at telephone number: (847)409-6737. The source told JAMES LNU to meet him at the MCDONALD'S RESTAURANT, located at the BRICKYARD MALL on West Diversey and North Narragansett. In this conversation, JAMES LNU told the source that he was approximately fifteen minutes from the downtown area and would call the source when he was near the MCDONALDS.

At approximately 11:00 a.m., JAMES LNU telephonically contacted the source and told the source that he was in the vicinity of the Kennedy Expressway and North Avenue, and would call again when he was nearby.

At approximately 11:06 a.m., a concealed recording device and a transmitting device were activated by the author Agent and placed on the source. The source then went to and parked in the parking lot of the MCDONALD'S RESTAURANT, located at West Diversey and North Narragansett, Chicago, Illinois. A short time later, JAMES LNU telephonically contacted the source and asked the source to meet him at the WALGREENS at Fullerton and Central. The source told JAMES LNU that he was going to stay at the MCDONALDS. A few minutes later, JAMES LNU telephonically contacted the source and told the source that he was near the BURGER KING RESTAURANT at West Fullerton Avenue and North Narragansett, and wanted the source to meet him there. The source told JAMES LNU that he was going to stay at the MCDONALD'S RESTAURANT because he was going to get something to eat and asked JAMES LNU to meet at the MCDONALDS instead.

---

Investigation on    3/25/2002    at    Chicago, Illinois    (telephonically)

File #    270F-CG-117142-A; 281C-CG-117362-BC1    Date dictated    3/26/2002

by    SA FRANK L. DEPODESTA:mkc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

0159

(Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____SOURCE_____, On 3/25/2002____, Page ___2____

       Shortly thereafter, JAMES LNU arrived at the MCDONALD'S RESTAURANT in a red colored Monte Carlo. JAMES LNU parked nearby the source and asked the source to get into his car. Once inside the car, JAMES LNU told the source that he was going to bring him to show him the counterfeit money. JAMES LNU, using his cellular telephone, called someone and asked them to bring the counterfeit money. JAMES LNU then pointed to a tan colored NISSAN Altima parked on North Narragansett, and told the source that was the car that contained the money. They pulled out of the MCDONALD'S parking lot and parked directly behind this same NISSAN Altima that was parked on North Narragansett. The NISSAN Altima was occupied by one person. The trunk of the NISSAN Altima was opened. JAMES LNU showed the source a black suitcase style bag in the trunk of the Altima which contained a large quantity of what appeared to be U.S. currency. Much of the currency appeared to be in $50 and $100 bills. The plate of the NISSAN Altima started with "J54."

       After looking at the money, JAMES LNU and the source got back into JAMES LNU's car and traveled back to the MCDONALD'S RESTAURANT. The source asked JAMES LNU how much he paid for this counterfeit money and JAMES LNU responded that he paid $40,000.00 in real U.S. currency for $300,000.00 in fake U.S. currency. JAMES LNU told the source that the source should not worry that he was not going to try and rip him off.

       The source told JAMES LNU that he spoke with the person who was going to supply them the fifteen kilograms of cocaine and said that the kilograms of cocaine were separated in multiple cars in the area. The source told JAMES LNU that he was going to depart and retrieve the first five kilograms of cocaine from a vehicle nearby. JAMES LNU told the source that he wanted to obtain at least ten kilograms of cocaine before he provided the counterfeit money to the source.

       The source then departed to retrieve the first five kilograms of cocaine. While en route, JAMES LNU telephonically contacted the source and again told the source that he (the source) could trust him (JAMES LNU) with the first five kilograms of cocaine. The source retrieved the first five kilograms of cocaine from a government vehicle that the author Agent had instructed the source would contain the cocaine. The source then traveled back to MCDONALDS with the five fake kilograms of cocaine. The source parked in the same area that he had parked before.

0160

Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of ____SOURCE_____ , On 3/25/2002 , Page __3__

      JAMES LNU pulled behind the source and popped the trunk of his (JAMES) car.  Prior to the source being able to place the five kilograms of fake cocaine into JAMES LNU's trunk, JAMES pulled away departing the MCDONALD'S parking lot.  JAMES LNU then telephonically contacted the source and told the source that there was a white van parked nearby that seemed suspicious.  JAMES LNU asked the source to come to the adjacent parking lot at the JEWEL and give him the five kilograms of cocaine there.

      The source departed the MCDONALD'S parking lot and traveled to the JEWEL parking lot, parking near JAMES LNU's vehicle.  The source carried the five fake kilograms of cocaine to JAMES LNU's vehicle and approached the passenger side.  The source pulled one of the fake kilograms of cocaine from the bag and handed it to JAMES LNU.  JAMES LNU said that it looked okay and gave it back to the source to put back in the bag.  The source then placed the bag containing the five fake kilograms of cocaine onto the passenger seat of JAMES LNU's vehicle.  JAMES LNU retrieved another one of the fake kilograms of cocaine from the bag, looked at it, and placed it back into the bag.  JAMES LNU told the source that when the source retrieved an additional five kilograms of cocaine he would then provide the source with the counterfeit money.  JAMES LNU then told the source something to the extent that, "I don't have to use my gun then, right."  The source responded, "No," and then walked away.  As the source walked away he (source) observed Agents pulling behind JAMES LNU's vehicle.  As soon as the Agents pulled behind JAMES LNU's vehicle, JAMES LNU pulled away and was struck by one of the Agent's vehicles.

      The source then traveled to a nearby location and waited for the author Agent.  At approximately 12:30 p.m., the concealed recording device and transmitting device were retrieved by the author Agent and deactivated.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                          )
                                         )
          Plaintiff,                     )
                                         )
          v.                             )          Civ. No. 06-1951(GK)
                                         )
United States Secret Service,            )
Federal Bureau of Investigation,)
Department of Justice,                   )
                                         )
          Defendants.                    )
_____)

EXHIBITS "12"

ONE (1) SMITH AND WESSON SEMI AUTOMATIC PISTOL MAGAZINE, SILVER IN COLOR WITH BLACK COLORED BUTT PLATE, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000438.

FIFTEEN (15) 9MM ROUNDS, TEN (10) HOLLOW POINT ROUNDS AND FIVE (5) BALL ROUNDS, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000438.

ONE (1) MAXWELL C45 CASSETTE TAPE CONTAINING A CONSENSUAL TELEPHONE CALL BETWEEN JAMES DONVILLE AND THE CRIMINAL INFORMANT ON 3/24/02, 10 MINUTES IN LENGTH, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000443.

ONE (1) COMPACT DISC CONTAINING THE RECORDING OF THE BODY WORE PLACED ON THE CRIMINAL INFORMANT BY THE FEDERAL BUREAU OF INVESTIGATION ON 3/25/02, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000442.

ONE (1) COMPACT DISC, CONTAINING A RECORDING OF THE CONVERSATION BETWEEN JAMES AND THE CRIMINAL INFORMANT, ON 3/21/02. APPROXIMATELY 41 MINUTES IN LENGTH, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000446.

ONE(1) XEROX WORKCENTRE M940 COPIER/SCANNER SERIAL #PTO092780, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) COMPAQ C31000 COPIER/ SCANNER SERIAL #5G0ADGZHJB8, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) DELL CPU TOWER DIMENSION XPS D300 SERIAL #BG6DD MODEL MMP, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) QUARTET 12" PAPER CUTTER MODEL 9112, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) LEXMARK BLACK HIGH RESOLUTION STANDARD PRINT CARTRIDGE 12A1970, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) LEXMARK COLOR HIGH RESOLUTION STANDARD PRINT CARTRIDGE 12A1980, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX BLACK INK CARTRIDGE Y100, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX CYAN INK CARTRIDGE Y101, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX MAGENTA INK CARTRIDGE Y102, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) 1LB BAG OF ALLIANCE STERLING RUBBER BANDS, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) BAG OF PRINTING SCRAPS, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000453.

TWO (2) POLAROID PHOTOGRAPHS, TAKEN BY SA JOHN MCCABE, OF A BLACK BAG CONTAINING COUNTERFEIT CURRENCY IN THE TRUNK OF TAMEKA ADDISON'S NISSAN ALTIMA HAVE BEEN INVENTORIED ON SSF 1544, SERIAL NUMBER 2012002CE000452.

THREE (3) POLAROID PHOTOGRAPHS, TAKEN BY MYSELF, OF A BLACK BAG CONTAINING FIVE (5) FAKE KILOGRAMS OF COCAINE IN THE PASSENGER SEAT OF DONVILLE JAMES' 2002 CHEVY MONTE CARLO, HAVE BEEN INVENTORIED ON SSF 1544, SERIAL NUMBER 2012002CE000452.

TWO (2) POLAROID PHOTOGRAPHS, TAKEN BY MYSELF, OF A FIREARM ON THE FLOORBOARD OF THE DRIVER'S SEAT OF JAMES' 2002 CHEVY MONTE CARLO,

0163
6/4/02 3:57 PM

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendants.                )
_____   )

EXHIBITS "13"

EXHIBIT "D"

COPY

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER |
|---|---|
| | 201 2002 CE 000442 |

| EVIDENCE HELD AGAINST | ☐ SPECIMEN | CASE NO. |
|---|---|---|
| JAMES DONVILLE | | 201-735-0131941-S |

| | OFFICE |
|---|---|
| | CHICAGO FIELD OFFICE |

| EVIDENCE INVENTORIED BY | | DATE OF INVENTORY | | |
|---|---|---|---|---|
| DANIEL A. DICK | 3/25/02 | 03/25/02 | PAGE 1 OF 2 PAGES |
| SIGNATURE - SPECIAL AGENT | DATE | REVIEWING SUPERVISOR |

| MICHAEL J NEWBERG | 03/25/02 | GLENN R. WESTLUND | 3/25/02 |
|---|---|---|---|
| SIGNATURE - WITNESS | DATE | SIGNATURE | DATE |

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:   ☐ FSD   ☐ CFT.

| | SIGNATURE - DIVISION | DATE |
|---|---|---|

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 3/25/02.<br><br>MARKED FOR IDENTIFICATION:  "DD 3/25/02" (SA DANIEL DICK).<br><br>COMPACT DISC, APPROXIMATELY 41 MINUTES IN LENGTH.  COMPACT DISC IS CONTAINED IN A JEWEL CASE. | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1644 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
AM

0165

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                     )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Civ. No. 06-1951(GK)
                                    )
United States Secret Service,       )
Federal Bureau of Investigation,    )
Department of Justice,              )
                                    )
        Defendants.                 )
_____     )

EXHIBITS "14"

EXHIBIT "E"



**COPY**

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER |
|---|---|
| | 201 2002 CE 000446 |

**EVIDENCE HELD AGAINST** ☐ SPECIMEN

JAMES DONVILLE

| CASE NO. | 201-735-0131941-S |
|---|---|

**OFFICE**
CHICAGO FIELD OFFICE

**EVIDENCE INVENTORIED BY**

DANIEL A. DICK    03/25/02
SIGNATURE - SPECIAL AGENT    DATE

| DATE OF INVENTORY | |
|---|---|
| 03/25/02 | PAGE 1 OF 2 PAGES |

**REVIEWING SUPERVISOR**

MICHAEL J. NEWBERG    03/25/02
SIGNATURE - WITNESS    DATE

GLENN R. WESTLUND    3/25/02
SIGNATURE    DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at: ☐ FSD ☐ CFT.

SIGNATURE - DIVISION    DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 03/21/02.<br><br>MARKED FOR IDENTIFICATION: "DD 03/21/02" (SA DICK).<br><br>COMPACT DISC, WHITE IN COLOR, LABELED WITH "CASE #201-735-131941-S", DATED 03/21/01 CONTAINED IN A JEWEL CASE. | NO VALUE |
| | | | TOTAL ————> | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
TM

8/15/02

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Donville James,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )          Civ. No. 06-1951(GK)
                                   )
United States Secret Service,      )
Federal Bureau of Investigation,   )
Department of Justice,             )
                                   )
        Defendants.                )
_____ )

EXHIBITS "15"

EXHIBIT "F"

COPY

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER |
|---|---|
| | 201 2002 CE 000443 |

| EVIDENCE HELD AGAINST          ☐ SPECIMEN | CASE NO. |
|---|---|
| JAMES DONVILLE | 201-735-0131941-S |

| | OFFICE |
|---|---|
| | CHICAGO FIELD OFFICE |

| EVIDENCE INVENTORIED BY | DATE OF INVENTORY | | | |
|---|---|---|---|---|
| DANIEL A. DICK                    3/25/02 | 03/25/02 | PAGE   1   OF   2   PAGES |

SIGNATURE - SPECIAL AGENT                    DATE

REVIEWING SUPERVISOR

MICHAEL J. NEWBERG          03/25/02          GLENN R. WESTLUND          3/25/02

SIGNATURE - WITNESS                    DATE          SIGNATURE                    DATE

I certify the evidence described in the page(s) of this inventory,
not otherwise disposed of per attached documentations, was
verified for final retention at:    ☐FSD    ☐CFT.

SIGNATURE - DIVISION                              DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/24/02 | 1 | THE BELOW LISTED ITEM WS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 3/25/02.<br><br>MARKED FOR IDENTIFICATION:  "DD 3/25/02" (SA DANIEL DICK).<br><br>CASSETTE TAPE MAXWELL C45, A SIDE LABELED "3/24/02 JAMES DONVILLE, 603PM-613PM COOPERATING WITNESS," B SIDE LABELED "CASE #201-735-131941-S" | NO VALUE |
| | | | TOTAL  ——> | NO VALUE |

UNITED STATES SECRET SERVICE                                        SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
FINAL          (C) 1 COPY TO ADMINISTRATIVE FILE 710.101
AM          (D) 1 COPY TO WORK FILE

0169

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Donville James,                          )
                                         )
      Plaintiff,                    )
                                         )
        v.                        )        Civ. No. 06-1951(GK)
                                         )
United States Secret Service,            )
Federal Bureau of Investigation,         )
Department of Justice,                   )
                                         )
      Defendants.                   )
_____)


### EXHIBITS "16"

**COPY**

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER |
|---|---|
| | 201 2002 CE 000454 |

| EVIDENCE HELD AGAINST          ☐ SPECIMEN | CASE NO. |
|---|---|
| JAMES DONVILLE | 201-735-0131941-S |

| | OFFICE |
|---|---|
| | CHICAGO FIELD OFFICE |

| EVIDENCE INVENTORIED BY | DATE OF INVENTORY | | | |
|---|---|---|---|---|
| MICHAEL J. NEWBERG *03/25/02* | 03/25/02 | PAGE | 1 | OF | 2 | PAGES |
| SIGNATURE - SPECIAL AGENT          DATE | REVIEWING SUPERVISOR |

| *Daniel A. Dick* *3/25/02* | GLENN R. WESTLUND    *3/25/02* |
|---|---|
| DANIEL A. DICK | SIGNATURE                DATE |
| SIGNATURE - WITNESS          DATE | I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:  ☐FSD  ☐CFT. |
| | |
| | _____    _____ |
| | SIGNATURE - DIVISION          DATE |

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS PRODUCED BY AN FBI SA ON 03/25/02 DURING A SURVEILLANCE/ARREST OPERATION.  THIS ITEM WAS TRANSFERRED TO SA ROBYN FIELD OF THE USSS CHICAGO FIELD OFFICE ON 03/25/02.  MARKED FOR IDENTIFICATION: "DD 03/25/02" (SA DICK).  MAXWELL MINI DIGITAL VIDEO CASSETTE IN CASE LABELED "JAMES REVERSE BUY/BUST 03/25/02" | NO VALUE |
| | | | TOTAL ——→ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
TM

0167